CUMIS INSURANCE SOCIETY, INC., Plaintiff,

v.

E. F. HUTTON & COMPANY, INC., George D. Oppenheimer & Co., Inc., George D. Oppenheimer, Generex Corporation, Joseph Saleh and Jacob Jaeger, Defendants.

E. F. HUTTON & COMPANY, INC., Third-Party Plaintiff,

v.

The CHESTNUT RUN FEDERAL CREDIT UNION, Third-Party Defendant and Fourth-Party Plaintiff,

v.

EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, a corporation of the State of Wisconsin and the Aetna Casualty and Surety Company, a corporation of the State of Connecticut, Fourth-Party Defendants.

No. 74 Civ. 4396 (GLG).

United States District Court, S. D. New York.

Oct. 16, 1978.

See also, D.C., 392 F.Supp. 76.

Hart & Hume, New York City, for plaintiff, by Eugene F. Brady, Gary Lloyd, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant, E. F. Hutton & Co., by Thomas F. Curnin, Adolpho R. Garcia, Kenneth A. Richieri, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

This securities action presents a good example of a plaintiff's deep-pocket theory that attempts to stretch the securities laws beyond recognition. The Court finds them not sufficiently elastic to reach this particular pocket.

The plaintiff, Cumis Insurance Society ("Cumis"), is the assignee of two credit unions, Wepco and Amcello, who were the victims of a fraud perpetrated by an investment advisor named George Oppenheimer. The complaint names E. F. Hutton & Co. ("Hutton"), a broker with which Oppenheimer did business, and several other parties as defendants. Three other defendants, Generex Corp., Joseph Saleh and Jacob Jaeger, have filed cross-claims against Hutton for indemnity or contribution.[1]

Over one and a half years ago, Hutton moved for summary judgment, under Fed. R.Civ.P. 56, on all claims against it. The plaintiff, agreeing that no material facts were in dispute, cross-moved for summary judgment on its claims against Hutton.

The initial papers raised phantom issues of fact sufficient under this Circuit's stringent requirements to require denial of the motions. The Court offered to hold an evidentiary hearing to resolve the apparent conflicts. The parties, however, represented to the Court that the facts were sufficiently clear that the case could be submitted on a stipulation of facts. After months of negotiation between counsel for Cumis and Hutton, that stipulation is now before the Court, and it establishes the following facts.

I

From 1969 to March, 1973, George Oppenheimer worked as a registered representative for Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). Oppenheimer became something of an expert in the accounts of credit unions, including the accounts of plaintiff's assignors, Wepco and Amcelle. This type of brokerage work was a fairly specific expertise, since the permissible investments of credit unions established under the Federal Credit Union Act, 12 U.S.C. §§ 1751–75, are restricted to obligations guaranteed by the United States, i. e., government securities. *See id.* § 1757(7). In March of 1973, Oppenheimer decided to leave Merrill Lynch and strike out on his own as a small investment advisor. He left Merrill Lynch with a good record, and he took with him some of his previous clients, including Wepco and Amcelle.

On March 19, 1973, Oppenheimer opened a margin account with Hutton in the name of George D. Oppenheimer & Co. One of the reasons that led him to Hutton was a social friendship with Darryl Vignon, a Hutton account executive. When he opened the account, Oppenheimer told Vignon and the Hutton branch manager, Jerome Lichtstein, that he would be investing for himself and others, but the "others" were not identified. Vignon and Lichtstein did not inquire as to Oppenheimer's clients, except to verify that he would not have

1. Third and fourth-party complaints have been filed, and various motions to dismiss involving these claims have been deferred pending disposition of the cross-motions for summary judgment by Cumis and Hutton.

more customers than the statutory limit above which he would have had to register as an advisor under the Investment Advisors Act, 15 U.S.C. §§ 80b–1 to 80b–21. *See id.* § 80b–3(b)(3).

At the time Oppenheimer opened the account, Hutton requested and received all the information necessary to fill out its standard forms for new margin accounts, including a copy of the certificate of incorporation of George D. Oppenheimer & Co., and corporate resolutions authorizing the opening of the account. Telephone inquiries by Hutton to Merrill Lynch confirmed that Oppenheimer had left Merrill Lynch in good standing and facilitated the transfer of his accounts at Merrill Lynch to the Hutton branch. Aside from these routine procedures, Hutton undertook no further investigation of Oppenheimer at that time.

The account became the largest and most productive one that Vignon had as an account executive. Oppenheimer made many purchases and sales of stocks through the account, and many large checks, including some drawn on Oppenheimer's personal bank account, were deposited. Frequent withdrawals of cash were also made by Oppenheimer. Through March and April, the only aberration of any sort in the account was the deposit of a $112,000 check, drawn on Oppenheimer's corporate bank account, which was later dishonored.

On May 2, 1973, Oppenheimer delivered to Hutton two Government National Mortgage Association certificates ("GNMAs")[2] issued in the name of Wepco, in the amounts of $200,000 and $300,000. The two GNMAs had been duly indorsed in blank by Wepco's manager, and Oppenheimer pledged them as collateral for loans extended by Hutton in the margin account. Oppenheimer had obtained the GNMAs after orally promising Wepco to use the proceeds generated by the pledges to invest on behalf of Wepco in government securities.[3] Since the GNMAs were effectively "bearer" instruments, Vignon and Lichtstein made no inquiry into how Oppenheimer had obtained possession of them, whether he planned to invest the proceeds on behalf of Wepco, or what authority he had in investing the proceeds. Vignon either was told or assumed that the proceeds of the loan would be invested on behalf of Wepco, but he did not inquire as to the nature of the investments Oppenheimer planned to make, nor was the topic of federal credit unions and their permissible investments discussed.[4] There is no evidence that Vignon or the branch manager, Lichtstein, were aware of the investment limitations on federal credit unions. Further, nothing on the certificates themselves indicated any limitation on Oppenheimer's authority with respect to them.

Unfortunately for Wepco, of course, Oppenheimer never intended to invest its money in government securities. Ultimately, he sought out some apparently speculative, high risk common stocks in an attempt to make larger profits. To aid his scheme, he sent fraudulent purchase and sales confirmations for government securities to Wepco to substantiate his claims that he was investing only proper government obligations.

There is no evidence that anyone at Hutton was directly involved in Oppenheimer's scheme. Indeed, the speculative stocks that he bought with Wepco's funds were pur-

---

**2.** These securities are commonly known as "Ginny Mays."

**3.** The oral agreement between Oppenheimer and Wepco guaranteed Wepco a 7 percent annual return, with Oppenheimer taking any profit over that amount up to 9 percent. Profit over 9 percent was to be shared equally between Wepco and Oppenheimer. Interestingly, it was clear at the time that no government security yielded more than 7 to 7½ percent annual interest, yet Oppenheimer apparently claimed that he could do better by rapidly purchasing and selling various government obligations.

Later, on July 16, 1973, the National Credit Union Administration issued an opinion to Wepco characterizing the agreement with Oppenheimer as "unacceptable," since it "divest[ed] the [Wepco] Board of Directors of the control it is required to exercise on investments made in behalf of the credit union."

**4.** See Joint Statements of Facts, July 18, 1977, ¶ 46.

chased through brokers other than Hutton with the funds taken from the margin account.[5] So far as the parties were able to determine, it appears that Oppenheimer never bought anything for Wepco or Amcelle through Hutton.

During May, the Oppenheimer account at Hutton continued to be very active. On May 23rd, Oppenheimer opened a second margin account, this one in the name of Hudson Valley Securities Corp. ("Hudson Valley"). As he had before, Vignon secured all the necessary information to complete the Hutton forms, including a certificate of incorporation for Hudson Valley and corporate resolutions authorizing the opening of the account. Also, as before, the only apparent aberration in the account in the weeks immediately thereafter was one check, in the amount of $380,000, which was deposited by Oppenheimer and later dishonored on June 13, 1973. Oppenheimer, however, managed to cover the check on that same day.[6]

On or around June 11th, Oppenheimer presented Hutton with another GNMA, this one issued in the name of Amcelle in the amount of $500,000. The certificate had been duly indorsed by Paul Herring, Amcelle's manager, to George D. Oppenheimer & Co. This GNMA had been obtained by Oppenheimer under an oral agreement with Amcelle identical in all material respects to the one he had made earlier with Wepco. *See* note 3 *supra*. Oppenheimer pledged the Amcelle GNMA as collateral in his Oppenheimer & Co. account, but there were two technical deficiencies in the transfer. Herring's signature on his indorsement had not been properly guaranteed, and the transfer indorsement to Hutton was made incorrectly on a bond transfer form rather than a government securities assignment form.

Apparently because of the large amount of the certificate, and because it was specially indorsed to Oppenheimer & Co., Lichtstein, the Hutton branch manager, requested that Oppenheimer document his right to possession of it. Oppenheimer produced a letter from Herring to him, stating in part that the indorsement had been "executed for your use in purchasing securities for the Amcelle Employees' Federal Credit Union." Lichtstein was evidently satisfied with this documentation and, again, there was no discussion of credit unions or the statutory restrictions on their investments. Instead, according to Oppenheimer's subsequent testimony, Oppenheimer represented to either Lichtstein or Vignon that he had complete authority to trade in securities of any type on behalf of Wepco and Amcelle. Oppenheimer also testified later that Hutton had no knowledge of his illegal scheme. In addition, the parties have stipulated that Hutton had no knowledge of Oppenheimer's oral agreements with the credit unions.

Throughout July, Oppenheimer continued to use the proceeds of the loans to invest in non-government securities, without the knowledge of Wepco or Amcelle. The activity in the Oppenheimer accounts was very heavy, and apparently because of the size and activity of the accounts, Lichtstein conferred with in-house counsel for Hutton on July 5th, to discuss the accounts and the GNMAs that were being used as collateral. At that time, Hutton's counsel advised only that Oppenheimer should not be permitted to draw checks on the accounts to himself individually, which previously had occurred once.

Hutton's counsel followed up his conference with Lichtstein by requesting a private investigation of Oppenheimer and his companies. In its report dated July 12th, Intel-

---

5. From the account statements submitted as exhibits on the motions, it appears that during May, June and July, Oppenheimer withdrew over $1,000,000 from the George D. Oppenheimer corporate account. During the same approximate period, he sold almost $2,000,000 in securities, thereby creating a margin balance facilitating the withdrawals.

6. Oppenheimer later testified that he used the Hudson Valley account for, among other things, effecting purchases and sales of securities between it and his George D. Oppenheimer & Co. account, in order to "buy time" to cover various purchases. The account statements reflect several "matched" or "crossed" transactions. There is no evidence, however, that anyone at Hutton was aware of this use of the two accounts to obtain a "float."

ligence Services, Inc. stated that its expedited investigation had revealed nothing perjorative about Oppenheimer. Rather, it found that Oppenheimer's finances were in apparent order, and that he had maintained an "excellent reputation in the vicinity of his residence and business address." Hutton's in-house counsel also verified from official sources that Oppenheimer's corporate records revealed no irregularities. No investigation was made concerning Oppenheimer's clients and their investments.

Through July, activity in the Oppenheimer account remained heavy. In August, however, the proverbial house of cards began to collapse. Because the three GNMAs were "self-liquidating" securities,[7] their value as collateral in the margin account was steadily decreasing. As a result, the credit Hutton had extended to Oppenheimer was becoming insufficiently collateralized, creating a margin call in the account.

Oppenheimer panicked. He disclosed his fraudulent scheme to Herring, the Amcelle manager, and offered to pay Herring a weekly bribe for his cooperation in further subsidizing Oppenheimer while Oppenheimer attempted to extricate himself from his financial morass. Herring refused, notified Amcelle's attorneys, who in turn notified the authorities, and Oppenheimer eventually pleaded guilty to a state criminal fraud charge and was sentenced to prison.

In the aftermath of the disclosures, the Wepco GNMAs were apparently reregistered by Hutton in its name and sold to cover the margin call in the Oppenheimer account. Amcelle, however, notified its transfer agent not to permit transfer of its GNMA. After some negotiation between Amcelle and Hutton, Amcelle's board of directors, on August 9, 1973, authorized transfer of the GNMA to Hutton in return for Hutton's cooperation in attempting to recover Amcelle's losses from Oppenheimer.

On August 10th, Hutton's representatives met with Amcelle's attorneys at the office of the Government National Mortgage Association in Washington, in order to facilitate transfer of the GNMA to Hutton. While the parties were obtaining a signature guarantee, necessary under Amcelle's regulations for Herring's indorsement on the certificate, Arnold Phelan of Hutton discussed the Oppenheimer story with Herring and Gary Leisure, an attorney for Amcelle. Phelan advised them of the general history of the Oppenheimer accounts at Hutton and made available all the account statements relating to the accounts. Plaintiff now emphasizes, however, that Phelan did not disclose the following: (1) that when Oppenheimer delivered the Amcelle GNMA to Hutton, Vignon either knew or assumed that the proceeds from the pledge were to be invested on behalf of Amcelle; (2) that Oppenheimer never purchased any government securities through Hutton; (3) that Oppenheimer had once drawn a check on his margin account to himself individually; and (4) that Oppenheimer twice had deposited in the accounts large checks which later were refused for insufficient funds.

After Herring's signature guarantee was obtained, the transfer of the Amcelle GNMA to Hutton was effected. Thereafter, the GNMA was sold by Hutton to cover the margin call in Oppenheimer's account.

## II

Jurisdiction of plaintiff's complaint is based on both the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78aa, and diversity of citizenship under 28 U.S.C. § 1332. The federal claims alleged against Hutton are for violations of section 10(b) of the 1934 Act and Rule 10b–5, 15 U.S.C. § 78j(b); 15 C.F.R. § 240.10b–5. In addition, plaintiff asserts a claim under Rule 405 of the New York Stock Exchange, the so-called "know your customer" rule. Under diversity jurisdiction, a state law claim for conversion of the Wepco and Amcelle GNMAs is also alleged. Essentially, the plaintiff's 10b–5 claim is pursued on an aiding and abetting theory, but the plaintiff

---

7. The GNMAs were "self-liquidating" in that monthly payments made to the owners of them included portions of principal and interest.

also apparently asserts a direct 10b–5 claim based on the events surrounding the reregistration of the Amcelle GNMA in Hutton's name. All of these will be discussed in turn.[8]

### A.

### The 10b–5 Aiding and Abetting Claim

Plaintiff's primary claim is based on an aiding and abetting theory. Simply stated, plaintiff's argument is that Oppenheimer committed a 10b–5 violation both in fraudulently inducing Wepco and Amcelle to part with their GNMAs and in buying speculative stocks in their behalf, and that Hutton aided and abetted Oppenheimer's fraud scheme.

The elements of a claim under such an aiding and abetting theory may be quite loose-knit, but they are, at least in name, quite clear. In *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978) (as amended, May 22, 1978), *petition for cert. filed*, 47 U.S.L.W. 3266, —— U.S. ——, 99 S.Ct. 642, —— L.Ed.2d —— (1978) the Second Circuit reiterated them as (1) proof of a securities law violation by the primary party; (2) knowledge by the defendant; and (3) substantial assistance of the primary party by the defendant. *Id.* at 47–48. *See also Hirsch v. duPont*, 553 F.2d 750, 759 (2d Cir. 1977).

As to the first element, Hutton does not dispute that Oppenheimer was guilty of a fraud within Rule 10b–5. Initially, he fraudulently induced Wepco and Amcelle to part with their GNMAs by representing that he would invest the proceeds only in legal investments. He then bought large amounts of speculative and unsuitable securities, while at the same time he continued to represent that he was buying only government securities. He kept the scheme alive by sending forged purchase and sale confirmations for government securities to Amcelle and Wepco. Under these circumstances, it would appear that Oppenheimer's fraud was sufficiently "in connection" with the purchase of the speculative securities to bring it within section 10(b). *See, e. g., Rolf v. Blyth, Eastman Dillon, supra* (investment advisor's purchases of unsuitable securities for client sufficient as a primary violation).

As to the third element, again Hutton does not argue that it did not lend assistance to Oppenheimer. As the Second Circuit pointed out in *Rolf*, 570 F.2d at 48, Professor Bromberg has suggested that substantial assistance "might include 'repeating misrepresentations (or aiding in their preparation), by acting as conduits to accumulate or distribute securities, by executing transactions or investing proceeds, *or perhaps by financing transactions.'* 2 A. Bromberg, *Securities Law* § 8.5 (515) (1974)." (emphasis added).

Hutton's "assistance" of Oppenheimer was solely the extension of credit on the three pledged GNMAs. The parties agree that Oppenheimer did not buy any of his illegal investments for the credit unions through Hutton, nor, apparently, did he make any securities purchases on behalf of them through Hutton. Hutton did not have any communications with Wepco or Amcelle, nor did it assist in any way Oppenheimer's continuing misrepresentations to the credit unions. Nonetheless, the exten-

---

**8.** There is considerable doubt whether Rule 405 of the New York Stock Exchange provides an independent federal right of action against brokers. *Compare Colonial Realty v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966) *with Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). Especially in light of the scienter required for 10b–5 actions by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), there are good reasons for finding no implied right of action under Rule 405's different "due diligence" standard. *See*

*Clark v. John Lamula Investors, Inc.*, No. 77–7098, slip op. at 4569, 583 F.2d 594 (2d Cir. Aug. 24, 1978) (Van Graafeiland, J., concurring); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 56 (2d Cir. 1978) (Mansfield, J., dissenting), *petition for cert. filed*, 47 U.S.L.W. 3266, —— U.S. ——, 99 S.Ct. 642, —— L.Ed.2d —— (1978). Nonetheless, the Court need not reach the question of an independent private right under Rule 405 in this case, since Rule 405 standards have been incorporated into state substantive law relating to the conversion claim. Accordingly, Rule 405 is discussed under section II B *infra*.

sion of credit and the maintenance of the margin accounts were integral to the success of the fraud, so that, assuming proof of the other elements of aiding and abetting liability, it would seem that Hutton's actions constituted "substantial assistance" of Oppenheimer.

The difficult element of aiding and abetting, and the one that prevents the imposition of liability on virtually everyone arguably involved, is the knowledge, or scienter, requirement.[9] There has been much debate, of course, about the Supreme Court's definition of the necessary scienter in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), a case pursued on an aiding and abetting theory. In *Hochfelder*, the Court held that proof of scienter, i. e., an "intent to deceive, manipulate or defraud," was required in 10b–5 damage actions. It left open the question whether "reckless behavior" might be sufficient in some circumstances, *id.* at 194 n.12, 96 S.Ct. 1375, and the Second Circuit has now held that at least when there is a fiduciary relationship between the plaintiff and defendant, "reckless disregard" of fiduciary duties is sufficient. *Rolf v. Blyth, Eastman Dillon, supra.*

In the instant case, it is clear that no fiduciary relationship existed between Hutton and Oppenheimer's customers, Wepco and Amcelle, so the question whether "reckless conduct" is sufficient in these circumstances is unresolved. The Court, however, finds no reason to indulge in semantic definitional games, for in this case it is clear that under any sensible standard of scienter Hutton cannot be held liable as an aider and abettor of Oppenheimer's fraud.

There is no evidence that any Hutton personnel had any actual knowledge of Op-penheimer's scheme. Instead, the plaintiff relies on the following chain of conclusions to demonstrate Hutton's "reckless" conduct: (1) that Vignon either knew or assumed that Oppenheimer was investing for the credit unions, and (2) Hutton should be charged with knowledge of the statutory restrictions on the investments of credit unions, and (3) since Vignon either knew or should have known that Oppenheimer was not purchasing government securities through Hutton, then (4) Vignon's failure to investigate further exactly what Oppenheimer was doing constituted "reckless" behavior sufficient to impose liability under Rule 10b–5.

Merely stating the plaintiff's tortured chain of conclusions is enough to refute it. Essentially, plaintiff's theory would impose a duty on brokers to monitor all the proceeds of every loan they extended and to investigate all the clients of their customers, the investment advisors. The credit unions, of course, had no reason or right to expect Oppenheimer's margin brokers to supervise the use of the proceeds, for they dealt with Oppenheimer, not Hutton. Moreover, plaintiff can point to no precedent for imposing such a wide-ranging duty on brokers. As will be discussed hereafter, a consideration of Hutton's conduct under the more strict commercial reasonableness standard of state conversion law shows no culpability on the part of Hutton. Under federal law, plaintiff's evidence does not even approach a showing of "highly unreasonable" conduct which represents "an extreme departure from the standards of ordinary care," *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 47, and it certainly reveals no intent to deceive, manipulate or defraud.[10] Without such a showing, Hutton

---

**9.** Since many large securities transactions require the mechanical aid of a number of collateral participants, *e. g.,* brokers, transfer agents, etc., 10b–5 aiding and abetting theory facially poses an extraordinary potential liability for numerous defendants who were guilty only of engaging in the usual and customary business activities. For this reason, proof of scienter, *i. e.,* something more than unknowing assistance or even negligent failure to discover another's fraud, becomes the all-important factor in distinguishing between those who actively abetted a fraud and those who were simply mechanical participants. *See generally* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, And Contribution,* 120 U.Pa.L.Rev. 597, 633 (1972); Note, *Rule 10b–5: Liability for Aiding and Abetting after Ernst & Ernst v. Hochfelder,* 28 U.Fla.L.Rev. 999 (1976). *See also* 2 A. Bromberg, *Securities Law:* § 8.5 (582) (1974).

**10.** Even *Rolf,* a case which seems to have pushed 10b–5 aiding and abetting liability to its

cannot be liable under Rule 10b–5 as an aider and abettor. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

### B.

### *The State Law Conversion Claim*

Under diversity jurisdiction, the plaintiff asserts a state law claim against Hutton for conversion of the three GNMAs. Hutton, in defense, argues that it was a bona fide purchaser of the three securities and, therefore, that it took them free of any adverse claim. *See* N.Y.Uniform Commercial Code § 8–301(2) (McKinney 1964) (hereinafter cited as "UCC").

A bona fide purchaser of a security is defined in section 8–302 of New York's UCC:

"A bona fide purchaser is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank."

UCC § 8–304 provides further:

"(1) A purchaser (including a broker for the seller or buyer but excluding an intermediary bank) of a security is charged with notice of adverse claims if

(a) the security whether in bearer or registered form has been indorsed "for collection" or "for surrender" or for some other purpose not involving transfer; or

(b) the security is in bearer form and has on it an unambiguous statement

that it is the property of a person other than the transferor. The mere writing of a name on a security is not such a statement.

(2) The fact that the purchaser (including a broker for the seller or buyer) has notice that the security is held for a third person or is registered in the name of or indorsed by a fiduciary does not create a duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims. If, however, the purchaser (excluding an intermediary bank) has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims.

(3) Except as provided in this section, to constitute notice of an adverse claim or a defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the security amounts to bad faith."

There is no dispute that Hutton, as a pledgee, was a purchaser for value. *See* UCC § 1–201(32). There is also no supportable claim that Hutton had actual knowledge "that the proceeds [were] being used . . . for the individual benefit of the fiduciary or otherwise in breach of duty" under section 8–304(2). Accordingly, the plaintiff's claim rests on the proposition that Hutton had "knowledge of such facts that . . . [amounted] to bad faith" under section 8–304(3).

---

outer limits, *see* 570 F.2d at 56 (Mansfield, J., dissenting), remains clearly distinguishable from the instant case. The defendant broker in *Rolf* had sufficient contacts with the plaintiff to support a finding of a fiduciary relationship between them, notwithstanding the interpositioning of an investment advisor. Moreover, the defendant actively communicated with the plaintiff, assuring him that the advisor was making proper investments. As the Second Circuit has now made clear, *Rolf*

"does not impose liability on a broker-dealer who merely executes orders for 'unsuitable' securities made by an investment advisor vested with sole discretionary authority to control the account. In the present case, the broker-dealer, although charged with super-

visory authority over the advisor and aware that the advisor was purchasing 'junk', actively lulled the investor by expressing confidence in the advisor without bothering to investigate whether these assurances were well-founded."

*Rolf v. Blyth, Eastman Dillon & Co.,* No. 77–7104 (2d Cir. May 22, 1978) (order amending prior opinion by adding new footnote 16A). In the instant case, Hutton had no contacts with the credit unions and certainly did not actively encourage them to do business with Oppenheimer. Indeed, this case is aptly characterized by the first sentence quoted above as one in which the broker merely made margin loans to an investment advisor vested with sole discretionary authority.

Under New York law, however, a broker attempting to take advantage of the bona fide purchaser protection of 8–301 must demonstrate compliance with the "know your customer" rule of the New York Stock Exchange. *Hartford Accident & Indemnity Co. v. Walston & Co.*, 21 N.Y.2d 219, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967). The correctness of this interpretation, particularly where federal standards are implicated, has been questioned. *See United States Fidelity & Guaranty Co. v. Royal National Bank*, 545 F.2d 1330, 1334–35 n.2 (2d Cir. 1976).

> Rule 405 requires a broker to:
>
> "Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization."

The plaintiff argues that Hutton did not fulfill its due diligence duties under Rule 405, and therefore, that Hutton cannot be protected as a bona fide purchaser of the GNMAs. Although there is doubt whether Rule 405 provides an independent federal right of action, *see* note 8 *supra,* and even more doubt whether, if it does, a third party to the transaction may invoke it, *see Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), these issues need not be reached, since, as noted above, Rule 405 standards have been adopted into state conversion law. *Hartford Accident & Indemnity Co. v. Walston & Co., supra.* Even though the standard of care under New York law is basically one of commercial reasonableness, clearly more exacting on the broker than the scienter required under Rule 10b–5, the plaintiff has not produced any evidence that Hutton acted in any manner inconsistent with due diligence requirements of Rule 405.

In *Hartford Accident & Indemnity*, a 4–3 decision of the New York Court of Appeals, the invocation of the "know your customer" rule was most literal. The defendant dealt with an imposter posing as one "Jack Arbe-tell" (who may have been a fictitious character). The imposter exhibited to the defendant only one or two business cards. The defendant's employees certified his identity on this basis without any other knowledge as to who he was. They clearly made little effort to "know their customer."

In this case, Oppenheimer had been doing extensive business with the defendant for a month and a half before he negotiated the first GNMAs. Further, Vignon had known Oppenheimer socially for a period of years. Oppenheimer was the person he claimed to be and was properly in possession of the GNMAs at the time they were pledged. Indeed, it is difficult to discern what would have happened differently if Hutton had taken further steps to verify Oppenheimer's right to pledge the GNMAs. The plaintiff does not dispute that the credit unions gave the GNMAs to Oppenheimer willingly, and even if Hutton had inquired of them at the time, they undoubtedly would have confirmed that Oppenheimer was the rightful possessor of the securities.

Moreover, nothing in *Hartford Accident & Indemnity* suggests that a broker's failure to investigate what its customer would ultimately do with the proceeds of an otherwise proper transaction could be "commercially unreasonable." What the Second Circuit said in *United States Fidelity & Guaranty Co. v. Royal National Bank* with respect to investigation of a customer's customers is equally applicable to investigation of a customer's intention with respect to his customer's accounts:

> "The transaction was made by Royal which was an established customer of the brokerage firm. Absent knowledge of any suspicious circumstances, and none here can be charged to the knowledge of Merrill Lynch, it had the right to rely on Royal with whom it had been dealing over the years. In our view, it would be inappropriate and in fact unduly onerous to require a broker which deals on any everyday basis with commercial banks or other institutional customers to make inquiry as to the bona fides of its customers' customers."

545 F.2d at 1335. The court then pointed out that the broker has a right to rely on its

customer's observance of reasonable standards in dealing with its own clients. Undoubtedly Oppenheimer did not observe reasonable standards when he invested the proceeds in unauthorized, illegal and speculative ventures. But the transfers of the GNMAs to Hutton were, when made, completely proper.

Plaintiff argues that if Hutton had known what its customer was up to in the following months it could have prevented his ill-conceived investments. It is true that by mid-July Hutton had some qualms about the manner in which Oppenheimer was doing business. (Undoubtedly, this uneasiness was a result as its own position as a creditor in the margin accounts rather than a concern for the position of its customer's customers.) By that time, however, the GNMAs had been pledged and were being held as security in the Oppenheimer account. Hutton had no knowledge as to what investments Oppenheimer was making on behalf of each of his customers and no knowledge whatever of investments being made through other brokers. Even if Hutton's July investigation revealed every aspect of Oppenheimer's dealings, and if complete disclosure had been made to all of Oppenheimer's customers, it would not have affected Hutton's claims to the pledged securities or prevented the investment losses that had already occurred.

■ Finally, the plaintiff can point to no authority construing Rule 405 to impose upon brokers a general duty to investigate the manner in which its customer, the investment advisor, invests the proceeds generated in a margin account. Indeed, the burden of such a duty would be massive, as it would effectively require a broker to identify and to investigate each customer of each investment advisor, and to inquire about the various agreements that the advisors had made with their clients. This duty would be more than burdensome; it would be ethically unsound. Rule 405 can-

not have been intended to effect such a drastic change in the brokerage industry. For all these reasons, Hutton cannot be found to have violated Rule 405 or acted in a commercially unreasonable manner, and it was, therefore, a bona fide purchaser of the GNMAs.

### C.

*The Reregistration of the Amcelle GNMA*

■ Finally, the plaintiff asserts a direct 10b–5 claim against Hutton based on the events surrounding the reregistration of the Amcelle GNMA, arguing that the Hutton representative did not make a complete disclosure to Amcelle before Amcelle permitted transfer of its GNMA. It is clear, however, that whatever disclosures Hutton made at that point, Amcelle could not have prevented reregistration and sale of the GNMA.[11]

Essentially, Amcelle cannot show the necessary materiality to support this 10b–5 claim. While the claimed nondisclosures seem trivial in light of what was already known, if they had been made, Amcelle's position would have been no better at that time than it is now. It might have been able to create problems or delays for Hutton in the sale of the GNMA, but because Hutton was a bona fide purchaser, Hutton clearly had the right to force reregistration to effect a sale for its own account. The technical difficulties in the Herring and Oppenheimer indorsements did not prevent them from successfully transferring the security and did not affect the rights of Hutton as a bona fide purchaser. *See* UCC § 8–308 (defining "indorsement"). Since the indorsements were legally sufficient and Hutton acted reasonably in accepting the security, its rights to the GNMA were complete.

---

11. Because of the Court's holding on the other aspects of the plaintiff's claims against Hutton, it is not necessary to address Hutton's argument in defense that Amcelle, by permitting reregistration and sale of the GNMA, waived any claim it had against Hutton with respect to the GNMA. It is also unnecessary to address Hutton's contention that plaintiff should be estopped from pursuing its claims because of the officially "unacceptable" nature of the agreements the credit unions entered into with Oppenheimer. *See* note 3 *supra.*

### III

After years of discovery and an exhaustive stipulation of facts, the plaintiff has simply not produced any more than its tortured logic to support its case against Hutton. For these reasons, judgment for Hutton on all claims by plaintiff must be granted. In addition, since the Court has found that Hutton violated no duty it owed to the plaintiff, and acted in a commercially reasonable manner in its dealings with Oppenheimer, the cross-claims of the co-defendants against Hutton, based on a theory of contribution among joint tortfeasors, must also be dismissed.[12] Settle order and judgment.

### SO ORDERED:

12. The co-defendants, Generex, Saleh and Jaeger, although not parties to the stipulation of facts submitted by the plaintiff and Hutton, have not opposed the disposition of the cross motions based on the stipulation.