FRANK M. JOHNSON, Jr., Circuit Judge:
Appellant Westchester County Savings and Loan Association (“Westchester”) appeals from the district court’s order affirming two bankruptcy court orders and final judgments granting appellee Irving Trust Company’s (“Irving Trust”) motion for summary judgment. The orders of the courts below established Irving Trust’s pri- or and superior rights as a bona fide purchaser to the proceeds from the sale of two Government National Mortgage Association (“GNMA”) certificates. Westchester seeks on appeal to establish that Irving Trust is not a bona fide purchaser and that it, Westchester, has a superior claim to the proceeds from the sale of the two GNMA certificates. The bankrupt, Legel, Braswell Government Securities Corporation (“Bras-well”), has not appealed. We affirm.
Braswell filed its petition in bankruptcy under Chapter XI on January 8, 1979; it was adjudicated a bankrupt on June 6, 1979. On January 15, 1979, Westchester instituted Adversary Proceeding No. 2 in the bankruptcy court by filing its complaint to recover certain GNMA certificates as to which it claimed ownership.[1] Irving Trust filed a counterclaim in Adversary Proceeding No. 2, alleging that its priority regarding the certificates was superior to that of Westchester. Irving Trust also instituted Adversary Proceeding No. 3 to determine the validity, priority, and extent of its lien on the certificates. The bankruptcy court granted Irving Trust’s motions for summary judgment in both proceedings and entered final judgments in Irving Trust’s favor.[2]
The securities at issue in this appeal are two GNMA certificates covering pool numbers 10772 and 13761.[3] An understanding *324 of how those certificates came to be in Irving Trust’s possession requires a discussion of the relationships of Westchester, Irving Trust, and Braswell with respect to those certificates.
Irving Trust agreed to provide dealer clearance services for Braswell, apparently pursuant to a Dealer Clearance Account Letter Agreement.[4] Irving Trust’s Dealer Clearance Department, pursuant to the instructions of Braswell, received and delivered securities and made payments and collections of money on behalf of Braswell. Each such transaction created a debit or credit position and if at the end of the day Braswell’s dealer clearance account had a debit balance, Irving Trust, pursuant to the Letter Agreement, established or continued loans to cover that balance. Irving Trust and Braswell also entered into a General Collateral Agreement pursuant to which Braswell granted to Irving Trust, as collateral security for the repayment of Bras-well’s obligations, a security interest in all of Braswell’s property and securities which were pledged by Braswell or delivered to Irving Trust for Braswell’s account. That agreement also granted Irving Trust the right as a secured party to dispose of any portion of the collateral security in order to satisfy Braswell’s obligations to Irving Trust.
In October 1978, Westchester obtained two loans from Braswell and pledged the two GNMA certificates covering pool numbers 10772 and 13761 as collateral security. Each GNMA certificate pledged as security exceeded the amount of the loan secured by that certificate. Westchester had previously executed a blank stock power with respect to each of those certificates. The stock powers, which were executed on United States Treasury Department form PD-1832, rendered the certificates fully negotiable and freely transferable. The transfers of the GNMA certificates as collateral security were transactions in the form of repurchase agreements or “repos,” pursuant to which Westchester sold the certificates to Braswell at a discount from their face amount subject to the right of Westchester to repurchase the same or equivalent securities 90 days hence at a higher price.[5] Irv *325 ing Trust asserts that until the commencement of this bankruptcy proceeding it was unaware of the repurchase agreement between Westchester and Braswell.
In December 1978, Irving Trust received from Braswell delivery instructions concerning the two GNMA certificates at issue in this case. The instructions informed Irving Trust that Braswell had purchased those certificates from Thomson McKinnon Securities and also that they would be delivered to Irving Trust’s Dealer Clearance Department for Braswell’s dealer clearance account, with payment to McKinnon for the certificates to be made from Braswell’s account.[6] The two certificates were delivered to Irving Trust by Thomson McKinnon’s agent, Morgan Guaranty Trust Company. The certificates identified Westchester as the registered owner, contained no restrictions on transfer, and were accompanied by blank stock powers duly executed by Westchester. Morgan Guaranty also delivered to Irving Trust delivery tickets evidencing that the securities were being delivered for the account of Thomson McKinnon against payment for the securities from Braswell’s account. The delivery tickets were stamped on behalf of Thomson McKinnon, with the legend “Repo Securities Do Not Transfer,” indicating that the name of the registered owner, Westchester, should not be changed.[7]
The district court affirmed the findings of fact of the bankruptcy court that: (1) Irving Trust held, pursuant to the General Collateral Agreement, a security interest in all securities it held for or on behalf of Braswell, including the GNMA certificates; (2) when Westchester transferred the certificates to Braswell, the. certificates were fully negotiable and without restriction; (3) Irving Trust gave value for the certificates because Irving Trust had a security interest in Braswell’s property and because Irving Trust paid pursuant to Braswell’s account for delivery of the certificates from McKinnon; and (4) the good faith of Irving Trust was neither questioned nor in issue. The district court also affirmed the bankruptcy court’s legal conclusions that: (1) the legend “Repo Securities Do Not Transfer” was insufficient to constitute notice to Irving Trust of an adverse claim; (2) Irving Trust was a bona fide purchaser having taken delivery of securities that were duly indorsed in blank and subject to a valid security agreement; and (3) Irving Trust’s rights to the proceeds of the sale of the certificates were prior and superior to Westchester’s rights.
Westchester urges two points on appeal in support of its contention that Irving Trust was not a bona fide purchaser: (1) *326 Irving Trust had notice of Westchester’s ownership interest in the certificates; and (2) Irving Trust did not act in good faith.[8] Westchester contends that Irving Trust had notice of Westchester’s ownership interest in the two GNMA certificates because the certificates were registered in Westchester’s name and because the delivery tickets were stamped indicating that the certificates were subject to repurchase agreements.
Irving Trust’s status as a bona fide purchaser is determined by the New York Uniform Commercial Code (McKinney 1964) (hereinafter cited as “U.C.C.”).[9] U.C.C. Section 8-301 provides that a transferee of an investment security acquires upon delivery whatever rights in the security his transferor had or had authority to convey and, further, if he is a bona fide purchaser under Section 8-302 he acquires the security free of any adverse claims. Section 8-302 provides:
A “bona fide purchaser” is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank.
It is not disputed that Irving Trust gave “value” for the certificates. Irving Trust, acting upon delivery instructions from Braswell and upon its receipt of the certificates from Thomson McKinnon for Braswell’s account, paid Thomson McKinnon for Braswell’s account. Additionally, Braswell owed Irving Trust on several preexisting partially secured claims. The collateral security agreement between Bras-well and Irving Trust gave the latter a security interest in all of Braswell’s securities which were pledged by Braswell or delivered to Irving Trust for Braswell’s *327 account. U.C.C. § 1-201(44) provides that a person gives value if he acquires rights as security for a pre-existing claim.
The definition of notice of an adverse claim is defined in U.C.C. § 8-304 which provides in pertinent part:

Notice to Purchaser of Adverse Claim

$ % * $ $
(2) The fact that the purchaser ... has notice that the security is held for a third person or is registered in the name of or indorsed by a fiduciary does not create a duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims....
(3) Except as provided in this section, to constitute notice of an adverse claim or a defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the security amounts to bad faith.
Subsection (2) of Section 8-304 allows a purchaser to accept securities registered in the name of a fiduciary or a third party without inquiry into the terms or nature of that fiduciary relationship, “except where the purchaser has knowledge (as distinct from ‘notice’ in the sense of ‘reason to know,’ U.C.C. § 1-201(25)) as to intended improper use of proceeds.” McKinney’s New York U.C.C. § 8-304, Practice Commentary. Subsection (3) of 8-304 is nonuniform and “may be construed to modify the otherwise applicable rules of U.C.C. § 1-201(25),” which define “notice.”[10] McKinney’s New York U.C.C. § 8-302, Practice Commentary. Subsection 8-304(3) of the New York version of the U.C.C., unlike the Official Text of the U.C.C., also provides that in order to charge a purchaser of investment securities with notice of adverse claims it is necessary to prove knowledge of such facts that the purchaser’s taking of the security amounts to bad faith. Whether Irving Trust acted in good faith and without notice of the claimed adverse interest of Westchester is a question of fact to be determined upon consideration of all the circumstances of the transaction. Oscar Gruss & Son v. First State Bank of Eldorado, 582 F.2d 424, 430 (7th Cir. 1978); Matthysse v. Securities Processing Services, Inc., 444 F.Supp. 1009, 1021 (S.D.N.Y.1977); United States Fidelity & Casualty Co. v. Goetz, 285 N.Y. 74, 78, 32 N.E.2d 798 (1941).
Westchester first contends that Irving Trust had notice of an adverse claim to the certificates, i. e., the ownership interest of Westchester, because Westchester was the registered owner, although not the holder, of the certificates. Westchester, as the registered owner, received the interest and principal pass-through payments from the mortgage company that issued the GNMA certificates. Westchester argues not only that Irving Trust should have concluded that Westchester was the owner of the certificates but also that it should have contacted Westchester concerning the latter’s ownership interest in the certificates. This contention is specifically refuted by U.C.C. § 8-304(2): mere registration of the certificates in Westchester’s name did not impose upon Irving Trust a duty of inquiry nor did it constitute notice of an adverse claim. Irving Trust’s mere knowledge that the certificates were registered in Westchester’s name did not amount to bad faith under U.C.C. § 8-304(3). The certificates were pledged by Westchester to Braswell without restriction, and Westchester’s delivery to Braswell of the certificates accompanied by stock powers indorsed in blank rendered the securities freely negotiable.[11] U.C.C. §§ 8-301, 8-308(3).
*328 Westchester also contends that Irving Trust had notice of an adverse claim to the certificates because the delivery tickets which accompanied the delivery of the certificates to Irving Trust were stamped with the legend “Repo Securities Do Not Transfer.” Westchester acknowledges, however, that this legend referred to the transaction by which Braswell repledged the certificates to Thomson McKinnon subject to Braswell’s own right of repurchase. Irving Trust was not a party to the transactions between Westchester and Braswell and, further, the delivery tickets make no reference to Westchester’s interest in the certificates. The phrase “Do Not Transfer” means merely that the name of the registered owner should not be changed.
Irving Trust was under no obligation to inquire as to the rights of the registered owner Westchester to the certificates that were delivered in fully negotiable form. In the absence of any restriction on the negotiability and transfer of the certificates, the designation, on collateral documents relating to transactions between Braswell and Thomson McKinnon, that the certificates were subject to a repurchase agreement did not constitute notice to Irving Trust of an adverse claim by Westchester. The use of repurchase agreements in connection with the pledging of government securities to secure underlying obligations between the debtor and the creditor is widespread. See Securities & Exchange Comm’n v. Miller, supra, 495 F.Supp. 465.[12] Westchester’s knowing delivery of the certificates to Braswell, accompanied by duly executed indorsements or stock powers in blank without restriction on further transfer, effectively belies Westchester’s contention that Braswell could not repledge those securities.
New York U.C.C. § 8-304(3) provides that, in order for a purchaser to have notice of an adverse claim, that person must have either knowledge of the adverse claim or knowledge of such facts that his taking the security amounts to bad faith. Subsection (3) of 8-304 “may be construed to modify the otherwise applicable rules of U.C.C. § 1-205(25),” which defines “notice.” McKinney’s New York U.C.C. § 8-302, Practice Commentary. Under Section 8-304(3) “the New York law is that only actual knowledge or disregard of suspicious circumstances may constitute evidence of bad faith”; mere negligence is not enough. Gutekunst v. Continental Insurance Co., 486 F.2d 194, 195-96 (2d Cir. 1973); see Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Trust Co., 466 F.Supp. 1133, 1145 n.26 (S.D.N.Y.1979); Garner v. First National City Bank, 465 F.Supp. 372, 382 (S.D.N.Y.1979); Matthysse v. Securities Processing Services, Inc., supra, 444 F.Supp. at 1021. Circumstances must put a purchaser on notice of wrongful transfer before his failure to inquire constitutes lack of good faith or gives rise to an inference of notice of an adverse claim. See, e. g., Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Trust Co., supra, 466 F.Supp. at 1145 n.26; Colin v. Central Penn National Bank, 404 F.Supp. 638, 641 (E.D.Pa.1975), aff’d, 544 F.2d 312 (3d Cir. 1976).
Westchester further claims that Irving Trust is not a bona fide purchaser under U.C.C. §§ 8-301, 8-302 because Irving Trust did not take the GNMA certificates “in good faith.” U.C.C. § 1-201(19) defines “good faith” as “honesty in fact in the conduct or transaction concerned.” First, Westchester argues that Irving Trust violated rules promulgated by the SEC governing the pledging or hypothecation of cus *329 tomers’ securities by brokers and dealers. 17 C.F.R. §§ 240.8c-l and 240.15c2-l. Second, Westchester urges that the General Collateral Agreement between Irving Trust and Braswell was entered into in bad faith and that Irving Trust’s failure to inquire as to Westchester’s ownership interest in the certificates evidences a lack of good faith. These contentions are without merit.
Westchester alleges that Braswell’s re-pledge of the certificates constituted a violation of the SEC hypothecation rules, which prohibit a broker from pledging securities carried for the account of a customer. Westchester argues that at least one of these two rules applied to Braswell and thus Braswell’s alleged violation is to be attributed to Irving Trust. These hypothecation rules apply, inter alia, to brokers and dealers who transact business in securities through any member of a national securities exchange. Irving Trust asserts that it, acting in the capacity of a dealer clearance agent, is not in the class of persons to which these rules were intended to apply.
Even assuming that SEC Rules 8c-l and 15c2-l applied to Westchester’s collateralized borrowings from Braswell, we do not agree with Westchester’s contention that the alleged violation of those rules by Braswell can be attributed to Irving Trust so that Irving Trust can be held to have acted in bad faith. Irving Trust obtained from Braswell a “Special Agreement for Brokers and Dealers in Regard to Hypothecation of Customers’ Securities” by which Braswell expressly warranted that it would comply with SEC rules governing the hypothecation of customers’ securities. Westchester contends that because Irving Trust received no notification from Braswell that Braswell had complied with those rules with respect to the GNMA certificates, Irving Trust cannot be found to have acted in good faith and therefore is not a bona fide purchaser. In the context of securities transfers the issues of good faith and notice are often intertwined.[13] Under New York law, “willful ignorance” may constitute bad faith. Otten v. Marasco, 353 F.2d 563, 565-66 (2d Cir. 1965); Hall v. Bank of Blasdell, 306 N.Y. 336, 341, 118 N.E.2d 464, 467 (1954). Irving Trust did not fail to act in good faith, i. e., it did not fail to act with honesty in fact in the conduct or transaction concerned, in relying on Braswell’s promise that it would comply with the SEC hypothecation rules. There is no evidence that Irving Trust’s Dealer Clearance Department acted other than in good faith in accepting the GNMA certificates repledged by Braswell and there is simply no merit in Westchester’s assertion that “Irving Trust in effect invited the fraudulent actions of Legel, Braswell” and that Irving Trust “should not be able to shield itself by its self-imposed ‘ignorance,’ particularly when that ‘ignorance’ was in violation of SEC rules.”
Nor is there merit in Westchester’s assertion that the General Collateral Agreement between Braswell and Irving Trust was entered into in bad faith. Westchester’s position is that Irving Trust acted in bad faith because under that Agreement it attempted to obtain a lien on property which could not be lawfully pledged by Braswell as security. Westchester stated that Irving Trust knew, as the clearing agent for Braswell, that Braswell would be holding securities owned by third parties such as Westchester which had pledged securities to Braswell subject to repurchase agreements. Under such circumstances, contends Westchester, Irving Trust’s failure to investigate or inquire into the ownership interest of Westchester amounted to bad faith. The collateral agreement expressly stated that Irving Trust obtained a lien upon “security incapable of pledge or inadequately pledged” only to the extent of Braswell’s “right, title and interest therein.” The GNMA certificates were capable of being repledged by Braswell and were in fact pledged by physical delivery to Irving Trust.
*330 Westchester next contends that Irving Trust obtained only a limited security interest in the GNMA certificates and then released that interest. Westchester asserts that under the General Collateral Agreement Irving Trust took only the interest in the GNMA certificates which Braswell had, i. e., Irving Trust took the pledge interest which Braswell had to convey and not the ownership interest that belonged to Westchester. Irving Trust correctly responds that as a bona fide purchaser it acquires the rights of the transferor and also acquires the securities free of any adverse claim. As discussed earlier, Westchester pledged the GNMA certificates to Braswell without restriction and Braswell in turn repledged the certificates to Irving Trust.[14] Our conclusion that Irving Trust is a bona fide purchaser — and thus acquires rights to the extent of the interest purchased, U.C.C. § 8-301(3) — disposes of Westchester’s contention that Irving Trust took “only” the interest which Braswell had. Irving Trust claims to have taken no more and, as indicated earlier Westchester pledged the certificates to Braswell without restriction and those certificates were accompanied by stock powers indorsed in blank and were fully negotiable.
Finally, Westchester claims that Irving Trust “released” the certificates which were in its possession as collateral to secure overnight loans which were made by Irving Trust to Braswell’s checking account to cover overdrafts. That contention is without merit. At the end of each business day Irving Trust’s Dealer Clearance Department would determine the amount of Bras-well’s outstanding obligation to Irving Trust on its dealer clearance account; if at the end of the day there was a debit balance in Braswell’s account, Irving Trust would establish or continue a loan to cover that balance. When loans were advanced to Braswell to cover its dealer clearance account, Irving Trust would place on a list of collateral all securities of Braswell which were in Irving Trust’s possession. Westchester relies upon the statement of an Irving Trust official that Irving Trust each morning “released” certain securities from its loans to Braswell. Irving Trust responds that that official’s statement about the release of securities refers to a bookkeeping practice. At the end of those days when Braswell had a debit balance in its dealer clearance account, Irving Trust would establish loans to cover that balance and, according to the Dealer Clearance Account Letter Agreement, Irving Trust was authorized to use all securities in its possession to secure such loans. When Braswell’s balance was no longer a debit balance the securities would be released as collateral for those loans.
The district court’s order entering summary judgment in favor of Irving Trust is AFFIRMED.

. In Adversary Proceeding No. 2 Westchester sought to recover five GNMA certificates from named defendants Irving Trust, Braswell, and Thomson McKinnon Securities, Inc. Three of those certificates were not in Braswell’s possession at the time the petition in bankruptcy was filed; consequently, those three claims were dismissed. The remaining two certificates are at issue in this appeal.

. Pursuant to an order of the bankruptcy court the two certificates at issue were sold by Irving Trust to Westchester for the then fair market value. As a result of the bankruptcy court’s final judgment in Irving Trust’s favor, the proceeds of that sale were applied against the outstanding obligations of Braswell to Irving Trust.

. A background discussion of GNMA certificates is important for an understanding of this case. A GNMA certificate (known as a Ginnie Mae) represents an interest in a pool of mortgages. In order to encourage housing financing, GNMA, a corporate instrumentality of HUD, guarantees the timely payment of principal and interest on these mortgage-backed certificates or securities. Ordinarily, and in the case of Westchester’s certificates, the mortgage pool consists of a collection of separate 30-year mortgages, each of which secures a single-family residence and bears the same interest rate and is insured by the Federal Housing Administration, Veterans Administration or Farmers Housing Administration. The mortgages are pooled and escrowed by an institutional mortgage lender, a GNMA certificate is issued in the name of the mortgage lender, and the GNMA guaranty is granted. The pool of mortgages is serviced by the issuer while the registered owner, whose name is carried on the books of the *324 insurer and GNMA as well as on the face of the certificate, receives payments representing the collection of principal and interest on the mortgages in the pool. The certificate carries as its original principal balance the total of the principal balances of all the mortgages in the pool, while the interest rate is that of the mortgages in the pool less a percentage for the GNMA guaranty fee and the mortgage lender’s servicing fee. The certificates are issued only in registered form with the owner designated on the face; however, they are negotiable, either by completion of an assignment form on the reverse of the certificate or by use of a special Treasury Department form.
Two GNMA certificates purchased by Westchester are at issue in this case: those covering pools numbered 10772 and 13761. Westchester received from the time of purchase of the certificates (January 1977) until Braswell declared bankruptcy (January 1979) monthly remittances of principal and interest collected from the pool of mortgages. The mortgagors or homeowners in this case made payments directly to the lender-mortgagee, which was also the issuer of the GNMA certificate, which then made “pass-through” payments of principal and interest to the registered owner of the GNMA — Westchester.

. The term “dealer clearance” refers to the process of clearing United States Government, money market, and municipal securities for Irving Trust’s dealer and broker customers. As the clearing agent, Irving Trust acts upon the instructions of its dealer and broker customers to receive and/or deliver designated securities. The Dealer Clearance Account Letter Agreement between Irving Trust and the bankrupt Legel, Braswell Government Securities Corporation has not been located. Irving Trust has included in the record a copy of a Dealer Clearance Account Letter Agreement between Irving Trust and Legel, Braswell Securities Corporation, a company affiliated with the bankrupt in this case. Irving Trust asserts that the letter agreement between itself and the bankrupt, were it located, would be shown to be identical to the agreement between itself and Legel, Braswell Securities Corporation. Irving Trust requires a signed letter agreement from its customer before it will begin clearing securities for the customer.

. A repurchase agreement or repo “is essentially a short-term collateralized loan” although it is in the form of a sale. Securities & Exchange Comm’n v. Miller, 495 F.Supp. 465, 467 (S.D.N. Y.1980). A repo is comprised of
two distinguishable transactions, which, although agreed upon simultaneously, are performed at different times: (1) the borrower *325 here, [Westchester] agrees to sell, and the lender [Braswell] agrees to buy, upon immediate payment and delivery, specified securities at a specified price; and (2) the borrower agrees to buy and the lender agrees to sell, with payment and delivery at a specified future date — or, if the agreement is “open,” on demand — the same securities for the same price plus interest on the price.
# $ s(s * sf: *
Repos customarily provide for a right of substitution, which means that the lender need not resell the identical securities purchased, but may substitute different securities of the same issue. Thus, the lender is not required to safekeep the collateral but may sell, pledge, use or dispose of it in any manner for any purpose, so long as he resells acceptable securities on the repurchase date.
Id. at 467, 469. There is no evidence in this case that the repurchase agreements provided for substitution of collateral; the confirmation slips contained no such provisions.

. Westchester had entered into several loan transactions with Braswell since January 1977; Westchester borrowed funds from Braswell by pledging its GNMA certificates subject to repurchase agreements. In each instance the GNMA certificates were delivered to Braswell accompanied by stock powers indorsed in blank by Westchester. As to the two GNMA certificates at issue in this case, Braswell apparently from time to time repledged these securities as security for its own borrowings from Thomson McKinnon; those repledgings of securities to McKinnon were also subject to repurchase agreements.

. The registration of the certificates in the name of Westchester, a third party to the transfer of the certificates from Thomson McKinnon to Irving Trust, had no effect upon the negotiability and transfer of those securities because Westchester had indorsed in blank the accompanying stock powers.

. The bankruptcy court’s finding of fact that Irving Trust’s good faith was neither questioned nor at issue was in effect a failure to make findings concerning the issue of Irving Trust’s good faith. Irving Trust raised its good faith as an affirmative defense in its answer to Westchester’s complaint in Adversary Proceeding No. 2 in the bankruptcy court. Also, Westchester argued to the bankruptcy court that Irving Trust violated certain Securities and Exchange Commission hypothecation or pledging rules, an argument which Westchester made to the district court and which it now makes to this Court in support of its contention that Irving Trust did not act in good faith. The district court expressly considered Westchester’s argument on appeal from the bankruptcy court’s grant of summary judgment that Irving Trust did not act in good faith. Where a district court fails to make necessary findings, a remand for entry of such findings is the usual recourse for an appellate court; however, where all of the issues on appeal may be fairly resolved from the record presented, a remand may not be required.
“[A] remand is unnecessary if all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court, or if all the facts relied upon to support the judgment are in the record and are undisputed, or if the record as a whole presents no genuine issue as to any material fact.”
King v. Commissioner of Internal Revenue, 458 F.2d 245, 249 (6th Cir. 1972), quoted in part in Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir. 1976). See Commissioner of Internal Revenue v. Gordon, 391 U.S. 83, 95 n.8, 88 S.Ct. 1517, 1524, 20 L.Ed.2d 448 (1968). In this appeal the parties have fully briefed and argued the issue of Irving Trust’s good faith. Under Fed.R. Civ.P. 56(c), a summary judgment may be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” As discussed infra, Westchester makes a two-pronged argument that Irving Trust did not act in good faith: Irving Trust violated certain SEC hypothecation rules and the General Collateral Agreement entered into between Braswell and Irving Trust evidenced the latter’s bad faith. We conclude that a complete and fair resolution of this issue may be made from the record on appeal and that the record as a whole reflects that there was no genuine issue of material fact regarding Irving Trust’s good faith. Consequently, this Court can and does conclude that, as a matter of law, neither the alleged violation of the SEC hypothecation rules nor the General Collateral Agreement constitutes bad faith by Irving Trust. A remand, therefore, is unnecessary.

. Although Westchester initially sought application of Florida law, it did not challenge below and does not challenge on appeal the bankruptcy court’s conclusion that the New York U.C.C. is applicable because all of the operative transactions took place in New York and both Westchester and Irving Trust are New York residents.

. U.C.C. § 1-201(25) provides:
A person has “notice” of a fact when (a) he has actual knowledge of it; or
(b) he has received a notice or notification of it; or
(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.
A person “knows” or has “knowledge” of a fact when he has actual knowledge of it. “Discover” or “learn” or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this Act.

. The blank stock powers duly executed by Westchester which were attached to the GNMA certificates effectively rendered them bearer instruments. See Cumis Ins. Soc., Inc. *328 v. E. F. Hutton & Co., Inc., 457 F.Supp. 1380, 1383 (S.D.N.Y.1978). The fact that Westchester’s transfer of the certificates to Braswell was subject to a repurchase agreement had no bearing on the negotiability of the certificates. The repo between Westchester and Braswell was ' evidenced by various confirmation slips which Westchester — but not Irving Trust — received from Braswell. Westchester did not enter on the face of the certificates a restriction on their transfer. See, e. g., U.C.C. §§ 8-204, 8-304(l)(a).

. A good discussion of the nature and use of repurchase agreements is contained in a General Statement of Policy issued by the SEC in connection with “Securities Trading Practices of Registered Investment Companies.” 44 Fed. Reg. 25128-134 (1979).

. See, e. g., Fidelity & Casualty Co. of New York v. Key Biscayne Bank, 501 F.2d 1322, 1326 (5th Cir. 1974) (under the U.C.C., the “ ‘good faith’ and ‘without notice’ requirements are practically synonymous”).

. Westchester delivered the certificates to Braswell accompanied by stock powers indorsed in blank. Also, Braswell had on many other occasions repledged securities which had been pledged to it indorsed in blank by Westchester.