EVA M. STERNER, PLAINTIFF v. DELMAR S. PENN, REGINA GUNN PENN, AMERI-TRADE, INC., ADVANCED CLEARING, INC., DEUTSCHE BANC ALEX. BROWN, INC. AND WALL STREET ACCESS, DEFENDANTS

No. COA02-827

(Filed 5 August 2003)

## 1. Securities— brokerage and clearing—negligence—no duty to third party

Negligence claims against brokerage firms and clearing companies did not state claims, and 12(b)(6) dismissals were properly granted, where the action arose from a third party's (Penn's) investment activities for plaintiff and there were no allegations that defendants acted as investment advisors to Penn or to plaintiff. Defendants had no duty to supervise and monitor Penn to protect plaintiff.

## 2. Securities— brokerage and clearing—constructive fraud

Constructive fraud claims against brokerage firms and clearing companies did not state claims, and 12(b)(6) dismissals were properly granted, where the action arose from a third party's (Penn's) investment activities for plaintiff and the complaint alleged that defendants benefitted by earnings commissions on the sales transactions ordered by Penn. Plaintiff did not allege that defendants sought to benefit themselves by taking unfair advantage of plaintiff.

STERNER v. PENN

[159 N.C. App. 626 (2003)]

**3. Securities— brokerage and clearing—unfair and deceptive practices statute—not applicable**

North Carolina's unfair and deceptive trade practices statute did not apply, and 12(b)(6) dismissals were properly granted, where the action arose from a third party's (Penn's) investment activities for plaintiff. Application of N.C.G.S. § 75-1.1 would create overlapping supervision, enforcement, and liability in an area of law pervasively regulated by state and federal statutes and agencies.

Appeal by plaintiff from order entered 5 February 2002 by Judge William Z. Wood, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 20 February 2003.

*S. Mark Rabil, for plaintiff-appellant.*

*Womble, Carlyle, Sandridge & Rice, P.L.L.C., by Ronald R. Davis and Allison R. Bost, for defendant-appellees Ameritrade, Inc. and Advanced Clearing, Inc.*

*Wilson & Iseman, L.L.P., by G. Gray Wilson and Maria C. Papoulias, for defendant-appellees Deutsche Banc Alex. Brown, Inc. and Wall Street Access.*

HUDSON, Judge.

Plaintiff Eva M. Sterner lost more than $160,000 that she had entrusted to defendant Delmar Penn, believing that he would invest the money for her. Penn used the services of defendants Ameritrade, Inc. ("Ameritrade"); Advance Clearing, Inc. ("Advanced Clearing"); Deutsche Banc Alex. Brown, Inc. ("Deutsche Banc"); and Wallstreet Access ("Wallstreet Access"), brokerage firms and securities clearing companies. Sterner sued the defendants, asserting claims for negligence, constructive fraud, and unfair and deceptive trade practices. Defendants moved to dismiss the suit, and the trial court granted the motion. For the reasons set forth below, we affirm the decision of the trial court.

BACKGROUND

According to the complaint, in the fall of 1998, plaintiff, a widow, met Penn, who told her that he was a highly successful investor. Penn and his wife promised to invest plaintiff's money and guaranteed plaintiff that they would double or even triple her investment.

Plaintiff agreed and, in September 1998, transferred a total of $170,700.00 to Penn for him to invest.

Penn placed plaintiff's money into accounts that he had opened with defendants Ameritrade and Deutsche Banc, both brokerage firms. The accounts were in the names of Delmar Penn and an entity known as BTL Worldwide Unlimited, Inc., which was not a valid corporation. Penn executed trades on plaintiff's behalf through Ameritrade and Deutsche Banc and through their respective securities clearing companies, Advanced Clearing and Wall Street Access. Penn traded through these accounts and lost all of plaintiff's money except for $2000, which he returned to her.

On 30 July 1999, plaintiff sued Penn and his wife for breach of contract, negligence, constructive fraud, and unfair trade practices. Because of criminal charges pending against Penn, the trial court stayed plaintiff's case. In September 2001, plaintiff moved to amend the complaint to add Ameritrade, Advanced Clearing, Deutsche Bank, and Wallstreet Access. The trial court allowed the motion, and plaintiff filed her amended complaint on 6 November 2001, adding claims of negligence, constructive fraud, and unfair and deceptive trade practices against these additional defendants.

On 11 January 2002, Ameritrade and Advanced Clearing moved to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). Shortly thereafter, Deutsche Banc and Wallstreet Access likewise filed a Rule 12(b)(6) motion. The trial court granted both motions, and plaintiff appealed to this Court. Plaintiff moved to voluntarily dismiss Penn and his wife without prejudice pending the outcome of this appeal, and the trial court granted the motion.

## ANALYSIS

Plaintiff assigns error to the trial court's grant of defendants' motions to dismiss. A Rule 12(b)(6) motion tests the legal sufficiency of the pleading. N.C.G.S. § 1A-1, Rule 12(b)(6) (2001); *Shaut v. Cannon*, 136 N.C. App. 834, 834-35, 526 S.E.2d 214, 215, *disc. rev. denied*, 352 N.C. 150, 543 S.E.2d 892 (2000). A Rule 12(b)(6) motion will be granted " '(1) when the face of the complaint reveals that no law supports plaintiff's claim; (2) when the face of the complaint reveals that some fact essential to plaintiff's claim is missing; or (3) when some fact disclosed in the complaint defeats plaintiff's claim.' " *Walker v. Sloan*, 137 N.C. App. 387, 392, 529 S.E.2d 236, 241 (2000)

STERNER v. PENN

[159 N.C. App. 626 (2003)]

(quoting *Peterkin v. Columbus County Bd. of Educ.*, 126 N.C. App. 826, 828, 426 S.E.2d 733, 735 (1997)). We treat all factual allegations of the pleading as true but not conclusions of law. *Id.* In sum, a Rule 12(b)(6) motion asks the court to "determine whether the complaint alleges the substantive elements of a legally recognized claim." *Embree Const. Group v. Rafcor, Inc.*, 330 N.C. 487, 490, 411 S.E.2d 916, 920 (1992).

A.

[1] Plaintiff argues first that the complaint sufficiently alleges a negligence claim against the four corporate defendants because it asserts that they negligently allowed Penn, an unlicensed broker, to transfer plaintiff's money from her account to the brokerage accounts and also because defendants failed to supervise the manner in which Penn invested plaintiff's funds. Because we can find no authority in North Carolina law for imposing a duty upon defendants to oversee Penn in these respects, we conclude that the trial court properly dismissed the claims for negligence.

To withstand a motion to dismiss, plaintiff's negligence complaint must allege "the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff." *Peace River Elec. Coop., Inc. v. Ward Transformer Co.*, 116 N.C. App. 493, 511, 449 S.E.2d 202, 214 (1994), *disc. rev. denied*, 339 N.C. 739, 454 S.E.2d 655 (1995). The sine qua non of a negligence claim is a legal duty owed by defendant to the plaintiff. *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 224 (4th Cir. 2002).

In North Carolina, securities broker/dealers like defendants have long been subject to liability for negligence to customers. *Folger v. Clark*, 198 N.C. 44, 150 S.E. 618 (1929). This case, however, presents a different question—whether a securities broker/dealer has a legal duty to "supervise" and "monitor" the investments ordered by its customer on behalf of that customer's client. Because our courts have not yet answered this question, we begin our analysis with authority from other jurisdictions.

Plaintiff's brief cites no persuasive authority indicating that securities broker/dealers are charged with such a broad duty, and we have found none. To the contrary, other courts have declined to impose the broad duty that plaintiff asks us to recognize and impose today.

In *Cumis Insurance Society, Inc. v. E. F. Hutton & Co.*, 457 F. Supp. 1380 (1978), for example, a federal district court in New York faced a similar situation. There, the plaintiff was an assignee of two credit unions who were the victims of a fraud perpetrated by an investment advisor named George Oppenheimer. The complaint named E. F. Hutton & Co., ("Hutton") a broker with which Oppenheimer did business, and several other parties as defendants, in part because Oppenheimer used Hutton's broker/dealer services to execute trades on behalf of his clients. *Cumis*, 457 F. Supp. at 1382-83. Specifically, the plaintiff alleged that Hutton knew or should have known about inappropriate investment orders that Oppenheimer had placed. *Id.* at 1387. The plaintiff premised the alleged constructive knowledge on Hutton's alleged duty to investigate all the clients of all its customers to ascertain the appropriateness of their customers' orders. *Id.*

The New York court held that no such duty existed for two persuasive reasons. First, the plaintiff itself had "no reason or right to expect [Hutton] to supervise the use of [its money], for they dealt with Oppenheimer, not Hutton." *Id.* Second, the plaintiff could find no precedent to support its argument that such a duty should be imposed on broker/dealers. *Id.*

Similarly, other courts have refused to impose a duty on broker/dealers to supervise and monitor the investment orders of their customers. The policy justifications for these decisions range from ethical considerations to simple economics. *See Unity House v. North Pacific Investments*, 918 F. Supp. 1384, 1393 (D. Hawaii 1996) (holding it would be unethical to require a broker/dealer to inquire into all the agreements between its customer and his or her clients); *Chee v. Marine Midland Bank, N.A.*, 1991 WL 15301 *4 (E.D.N.Y. 1991) (stating that "[t]here is even greater reason to reject monitoring liability in the case of discount brokers whose admitted function is not to give advice so investors can save money on commissions").

In *Eisenberg*, 301 F.3d 220, the Fourth Circuit, applying North Carolina law, held that a bank does not owe a duty to a noncustomer with no relationship to the bank who is defrauded by the bank's customer through use of its services. *Eisenberg*, 301 F.3d at 225. The court found that the plaintiff fell "into the undefined and unlimited category of strangers who might interact with [defendant's] customer." *Id.* at 226. To extend defendant's duty to include strangers like plaintiff, the court reasoned, "would expose banks to unlimited liability for unforeseeable frauds." *Id.*

Although the facts in *Eisenberg* are distinguishable from those before us, we find the logic of the decision and its public policy considerations analogous and persuasive. Plaintiff alleges that defendants "owed a duty to exercise reasonable care and diligence in their relationship with the Plaintiff" and that they breached this duty when they failed to properly supervise Penn, their customer, or to "monitor the funds or investments of the Plaintiff," which were ordered by Penn. We cannot agree that this could state a claim under North Carolina law, as we see no basis to impose such a "wide-ranging duty on brokers." *Cumin*, 457 F. Supp. at 1387. Plaintiff alleges that defendants executed Penn's investment orders. There are neither allegations that defendants acted as investment advisors to Penn, nor to plaintiff. Because defendants had no duty to supervise and monitor Penn's actions to protect plaintiff, we hold that plaintiff's negligence claim fails. *Meyer v. McCarley & Co.*, 288 N.C. 62, 68, 215 S.E.2d 583, 587 (1975) (holding that the "existence of a legal duty" constitutes the threshold requirement for a negligence action).

Thus, we hold that plaintiff's claim for negligence against defendants is legally insufficient and, therefore, that the trial court properly granted defendants' motion to dismiss on this basis.

B.

[2] Plaintiff also argues that her complaint sufficiently alleges a constructive fraud claim against defendants. Again, we disagree.

In *State Ex Rel. Long v. Petree Stockton, L.L.P.*, 129 N.C. App. 432, 499 S.E.2d 790 (1998), *cert. dismissed*, 350 N.C. 57, 510 S.E.2d 374 (1999), we described the essential elements of a claim based on constructive fraud. To survive a motion to dismiss, such a claim must:

allege facts and circumstances (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff. Further, an essential element of constructive fraud is that defendants sought to benefit themselves in the transaction.

*Petree Stockton, L.L.P.*, 129 N.C. at 445, 499 S.E.2d at 798 (citation and quotation marks omitted); *see also Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666-67, 488 S.E.2d 215, 224 (1997). The benefit sought by the defendant must be more than a continued relationship with the plaintiff. *Barger*, 346 N.C. at 667, 488 S.E.2d at 224.

Moreover, "payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage." *Nationsbank of N.C. v. Parker*, 140 N.C. App. 106, 114, 535 S.E.2d 597, 602 (2000) (holding that where plaintiff alleged that the defendant "took advantage of his position of trust and benefitted from his actions in that he was paid for his services," such an allegation by itself was insufficient to show that the defendant sought his own advantage).

Here, plaintiff alleges in her complaint that defendants, acting as broker/dealers, accepted her money, thereby creating a relationship of trust and confidence between them. Without deciding whether those allegations are sufficient, we affirm the dismissal of plaintiff's constructive fraud claim based on her failure to allege that defendants sought a benefit through that relationship. The closest allegation is that plaintiff contends that her money was traded through defendants and that defendants financially benefitted via "commissions" on "sales transactions."

We conclude, therefore, that the complaint, taken in the light most favorable to plaintiff, alleges simply that defendants benefitted by earning commissions on the sales transactions ordered by Penn. This allegation, by itself, is not enough; it fails to show that defendants sought to benefit themselves by taking unfair advantage of plaintiff, as our law requires. Thus, we affirm the trial court's dismissal of plaintiff's constructive fraud claim.

C.

[3] Plaintiff also contends that our unfair and deceptive trade practices statute, G.S. § 75-1.1 et seq., is applicable to securities transactions such as those executed by defendants. Specifically, she alleges that defendants facilitated Penn's wrongful actions by accepting money transferred directly from plaintiff's bank accounts to those opened by Penn; by allowing plaintiff's money to be invested through an unlicensed broker and failing to verify whether Penn was a licensed broker; by failing to verify whether BTL Worldwide Unlimited, Inc. was a valid corporation; and by failing to monitor the "appropriateness of the ridiculous investments" that Penn made. We agree with the trial court, and with defendants, that North Carolina's Unfair and Deceptive Trade Practices Act does not apply to the present situation.

The Unfair and Deceptive Trade Practice Act ("UDTPA" or "the Act") prohibits unfair trade practices affecting commerce. N.C. Gen.

Stat. § 75-1.1 (2001). The UDTPA does not govern "all wrongs;" accordingly, plaintiffs must "first establish that defendants' conduct was in or affecting commerce before the question of unfairness or deception aries." *HAJMM v. House of Raeford Farms*, 328 N.C. 578, 592-93, 403 S.E.2d 483, 492 (1991) (citation and quotation marks omitted). Commerce is defined as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b) (2001).

In addition to the explicit exception for members of a learned profession, common law exceptions to the Act have evolved since the statute was created. Relevant here, our Supreme Court has explicitly held that "securities transactions are beyond the scope" of the UDTPA. *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985). According to the Court in *Skinner*, the UDTPA does not apply to securities transactions because such application would create overlapping supervision, enforcement, and liability in an area of law that is already pervasively regulated by state and federal statutes and agencies. *Id.*; *see also Dalton v. Camp*, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001); *HAJMM*, 328 N.C. at 593, 403 S.E.2d at 493 (1991).

We have found one decision that closely parallels the situation here. In *Harrah v. J.C. Bradford & Co.*, 37 F.3d 1493, 1994 WL 543528 (4th Cir. Oct. 6, 1994), an individual convinced several investors to allow him to invest their money in stock options, guaranteeing them "large returns with no risk of loss." *Id.* at *1. The individual invested the plaintiffs' money through trading accounts with the defendant, a brokerage firm. *Id.* There was no indication that the defendant knew the sources of the funds. When the plaintiffs demanded that the individual return their money, he returned small amounts but never fully repaid them. *Id.* at *2. Plaintiffs then sued, alleging, inter alia, that the defendant had violated the UDTPA. *Id.* The district court granted summary judgment for the defendant.

The Fourth Circuit then affirmed the trial court, holding that the plaintiffs could not bring an UDTPA claim against the defendant brokerage firm. *Id.* at *3. As the court explained, the individual's transactions with the defendant were "plainly securities-related activities." *Id.* at *4. The UDTPA does not govern securities transactions because there is " 'pervasive and intricate' securities regulation under both the North Carolina Securities Act as well as the Securities Exchange Act of 1934." *Id.* at *3 (citing *Skinner*, 314 N.C. at 274, 333 S.E.2d at 241).

Penn here, like the individual in *Harrah*, convinced plaintiff to permit him to invest her money and also guaranteed large returns. Using plaintiff's money, Penn, again like the individual in *Harrah*, invested funds with Ameritrade and Deutsche Banc and conducted the trading activity through Advanced Clearing and Wallstreet Access. We are persuaded that the Fourth Circuit's reasoning in *Harrah* is sound and, therefore, we hold that North Carolina's UDTPA has no application here.

Plaintiff relies on *HAJMM*, 328 N.C. 578, 403 S.E.2d 483, for her contention that the sale of securities can be classified as a commercial transaction, so that the UDTPA comes into play. In *HAJMM*, the defendant, whose main business involved processing turkey and other poultry, issued revolving fund certificates. *Id.* at 580-81, 403 S.E.2d at 485. The Supreme Court held that the UDTPA did not apply, extending its decision in *Skinner* (that the Act does not apply to corporate securities) to the revolving fund certificates at issue in *HAJMM*. This holding had two grounds. First, securities transactions are already subjected to pervasive regulation by other sources. *Id.* at 593, 403 S.E.2d at 493. Second, the Court explained, the "legislature simply did not intend for the trade, issuance and redemption of corporate securities or similar financial instruments" to constitute business activities as that term is used in the Act:

> "Business activities" is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized.

> Issuance and redemption of securities are not in this sense business activities. The issuance of securities is an extraordinary event done for the purpose of raising capital in order that the enterprise can either be organized for the purpose of conducting its business activities or, if already a going concern, to enable it to continue its business activities. Subsequent transfer of securities merely works a change in ownership of the security itself.

*Id.* at 594, 403 S.E.2d at 493. Accordingly, the transactions at issue were not " 'in or affecting commerce,' even under a reasonably broad interpretation of the legislative intent underlying these terms." *Id.*

Plaintiff takes heart in the second explanation and contends that the UDTPA applies here because defendants' central business activ-

ity actually *is* securities transactions. In light of the Supreme Court's clear pronouncement in *Skinner* that the Act does not apply to securities transactions, however, we must affirm the trial court's dismissal of this count.

## CONCLUSION

For the reasons set forth above, we affirm the decision of the trial court to dismiss plaintiff's complaint.

Affirmed.

Judges McGEE and STEELMAN concur.