Loftin v. QA Invs. LLC, 2015 NCBC 41.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
03 CVS 16882

PETER T. LOFTIN,

Plaintiff,

v.

QA INVESTMENTS LLC; QUELLOS
GROUP, LLC; PRESIDIO GROWTH
LLC; and PRESIDIO ADVISORY
SERVICES, INC.,

Defendants.

ORDER & OPINION

{1}     THIS MATTER is before the Court on Defendants' Motion to Dismiss the Amended Complaint ("Motion"), made pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)").  For the reasons expressed below, the Motion is DENIED in part and GRANTED in part, and Plaintiff is requested to file a second amended complaint consistent with this Order & Opinion.

*The Brocker Law Firm, P.A. by Douglas J. Brocker and Crystal S. Carlisle and Eagan Avenatti LLP by Michael J. Avenatti (pro hac vice) for Plaintiff Peter T. Loftin.*

*Parker, Poe, Adams & Bernstein, LLP by William L. Rikard, Jr. and Sara F. Hutchins for Defendants QA Investments LLC and Quellos Group LLC.*

Gale, Chief Judge.

## I.     INTRODUCTION

{2}     Loftin alleges claims related to the certain defendants' involvement in the development, marketing, implementation, and Loftin's subsequent purchase, of unlawful tax shelter products known as Foreign Leveraged Investment Programs ("FLIP") and Bond Linked Issue Premium Structures ("BLIPS").  This Motion is limited to the FLIP products, from which Loftin claims he experienced damages.

The case was stayed for several years pending resolution of matters before the United States Tax Court. Claims against some Defendants have been dismissed. The Court has reactivated the case. QA Investments LLC and Quellos Group, LLC have moved to dismiss Loftin's claims of civil conspiracy, fraud, breach of fiduciary duty, constructive fraud, negligent misrepresentation, and unfair and deceptive trade practices ("UDTP" or "Chapter 75"). Their Motion is now before the Court and, after briefing and argument, is ripe for ruling.

## II. THE PARTIES

{3} Plaintiff Peter T. Loftin is or was a resident of Wake County, North Carolina.

{4} Defendant QA Investments, LLC is a Delaware company with its principal place of business in Seattle, Washington.

{5} Defendant Quellos Group, LLC is a Delaware company with its principal place of business in Seattle Washington and is the parent of QA Investments. This Order & Opinion will refer to QA Investments, LLC and Quellos Group, LLC collectively as "QA."

{6} KPMG LLP ("KPMG") is a Delaware limited liability partnership headquartered in New York, New York. When the Amended Complaint was filed, KPMG was allegedly the third-largest accounting firm in the United States. Plaintiff voluntarily dismissed claims against KPMG with prejudice on November 20, 2013. Sidley Austin Brown and Wood, LLP ("Sidley Austin") is a Delaware limited liability partnership with its principal place of business in Chicago, Illinois and is one of the largest law firms in the United States. Claims against Sidley Austin were also voluntarily dismissed with prejudice.

{7} Defendants Presidio Growth, LLC and Presidio Advisory Services, LLC (collectively, "Presidio Defendants"), are Delaware companies with their primary places of business in San Francisco, California. Plaintiff alleges that Presidio Advisory Services, LLC, is the alter ego of Presidio Growth. This Order and Opinion will collectively refer to these defendants as "Presidio."

## III.   BACKGROUND

{8}   Plaintiff filed his original Complaint on December 15, 2003, subsequently filing his Amended Complaint on November 8, 2006, and asserting the following claims against QA: (1) civil conspiracy, (2) fraud, (3) breach of fiduciary duty, (4) constructive fraud, (5) negligent misrepresentation, and (6) UDTP.  KPMG and Sidley Austin are alleged coconspirators.

{9}   The case was designated as an exceptional case and assigned to Hon. Ben F. Tennille, on July 25, 2006.  The case was stayed on January 5, 2007, by a consent motion seeking to stay further proceedings pending resolution of a pending matter before the United States Tax Court.  The case was subsequently assigned to the undersigned in 2011 following Judge Tennille's retirement.  At Plaintiff's request, the stay was lifted following a status conference held on September 19, 2014.  QA filed, and the parties briefed, the motion to dismiss after the status conference. The Court then heard oral argument on February 12, 2015.

{10}   The Court recites the following facts solely for purposes of this Motion, accepting the allegations of the Complaint as true without assuming the truth of Loftin's legal conclusions. *Walker v. Sloan*, 137 N.C. App. 387, 392, 592 S.E.2d 236, 241 (2000).[1]

### A.  Development of FLIP

{11}   In the mid-to-late 1990s, KPMG began developing turn-key tax products that it could market to high income clients. (Am. Compl. ¶ 12.)  KPMG enlisted QA to assist in constructing transactions involving offshore entities: FLIP, and later for the Offshore Portfolio Investment Program ("OPIS").  (Am. Compl. ¶ 14.)  Tax products involving these transactions were very complex, "and [were]

---

[1] Because of the length and detail of the Amended Complaint, consisting of ninety-nine pages and 219 numbered paragraphs, the Court does not seek to describe every relevant factual detail here, but instead provides an overview of the narrative that led to the present action.  The Court describes the specific, relevant facts in its analysis of the claims below.  At oral argument, Plaintiff offered newly developed facts that may be included in a second amended complaint.  To avoid any potential prejudice, the Court restricts its analysis of the present Motion to the facts alleged in the current Amended Complaint.

really based more on the structuring of the entities involved in the securities transactions rather than the security transactions themselves." (Am. Compl. ¶ 15.)

{12} In September 1996, QA sent a confidential memo to UBS AG ("UBS") that outlined the basics of the securities transactions, including that KPMG would follow up with a memo describing how the tax objectives were to be achieved. Because FLIP was a prepackaged product, the nature of the transactions did not vary between clients; only the amount of capital loss required to achieve the desired tax impact varied.

## B. <u>Loftin's Purchase of FLIP</u>

{13} During the summer of 1997, Loftin expected a possible capital gain of $30 million from the sale of a business. Loftin's advisors recommended that he meet with KPMG regarding how to handle the tax effect of the capital gains. During a meeting on August 7, 1997, KPMG representatives recommended that Loftin purchase FLIP.

{14} During that meeting and others, KPMG stated that Loftin could reap substantial returns, as well as tax benefits, from investing in FLIP. Upon asking whether his lawyer could review FLIP, he was told that his lawyer would be unable to understand the complexity of the transaction. Loftin was reassured that the tax transaction was researched and confirmed by both KPMG and Sidley Austin.

{15} A KPMG partner told Loftin that, in order to invest in FLIP, he would have to engage QA, which was knowledgeable about FLIP and the transactions of which FLIP was comprised. KPMG also told him that he must retain KPMG to perform his accounting and tax returns. That partner assured Loftin that FLIP complied with IRS rules and regulations and that FLIP would not lead to IRS scrutiny.

{16} Loftin signed an engagement letter with KPMG for FLIP on August 22, 1997. Loftin then executed an Investment Advisory Agreement with QA as the investment advisor and KPMG as the financial advisor on September 3, 1997.

{17}    On September 5, 1997, QA directed Loftin to authorize two wire transfers, one for the purchase of UBS shares, and one to purchase a warrant in a Cayman Island Corporation called Lark Haven Capital, Inc. ("Lark Haven"). QA then directed Maples & Calder, a law firm, to incorporate Lark Haven as a Cayman Island exempt entity. On September 15, 1997, as directed by KPMG and QA, Lark Haven retained QA as its investment advisor. On September 16, 1997, QA purchased a warrant from Lark Haven that would expire on September 30, 1998.

{18}    On October 21, 1997, KPMG billed QA for consultation regarding the tax consequences of transactions entered into on behalf of Loftin by QA.

{19}    Between September 1997 and May 12, 1999, QA performed numerous other similar transactions, implementing FLIP on Loftin's behalf.

## C. Loftin's Claimed Losses

{20}    In or around September 1997, KPMG began having internal discussions regarding whether FLIP should register with the IRS as a tax shelter, ultimately deciding against registration. During these discussions, on October 9, 1997, QA wrote to KPMG requesting a letter from KPMG to alleviate QA's concern about penalties for noncompliance with IRS tax shelter registration provisions. KPMG then communicated to QA that it did not intend to register FLIP as a tax shelter. QA elected not to register FLIP as a tax shelter at that time.

{21}    On or about March 27, 1998, UBS informed QA that it would no longer participate in the FLIP strategy because of its concern that it should be registered as a tax shelter.

{22}    On June 1, 1998, QA registered FLIP with the IRS as a tax shelter without informing Loftin.

{23}    On October 12, 1998, KPMG filed Loftin's 1997 tax returns, claiming a $27,416,629.00 long-term capital loss associated with FLIP. In October 2000, the IRS initiated an audit of Loftin's 1997 tax return. Loftin quickly executed a power of attorney, allowing KPMG's tax controversy professionals to represent him in the audit. KPMG later withdrew from the representation.

{24}    The IRS disallowed all capital losses on Loftin's tax returns related to FLIP, and assessed him with $6,024,998.00 in tax deficiencies and $2,326,169.99 in penalties, plus interest on the back taxes.

{25}    In 2003, the Senate released a report entitled "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers and Financial Professionals" ("2003 Senate Report").  The 2003 Senate Report described KPMG's development, aggressive marketing, and concealment of "potentially abusive and illegal tax shelters." (Am. Compl. ¶ 94(a).)  It further stated that certain other major banks and investment advisory firms were also involved.

{26}    On April 13, 2005, a further Senate report was issued, which included a statement that "[s]ome investment advisors, including Presidio Advisory Services and the Quellos Group, helped develop, design, market, and execute potentially abusive or illegal tax shelters such as FLIP, OPIS and BLIPS." (Am. Compl. ¶ 95(c).)

{27}    On August 26, 2005, as part of a deferred prosecution agreement, KPMG admitted that it concealed unlawful and fraudulent tax shelters.  It subsequently agreed to pay the United States $456 million.

## IV.    ANALYSIS

{28}    On a motion to dismiss pursuant to Rule 12(b)(6), the Court inquires "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).  The Court may grant the Motion if the Amended Complaint reveals the absence of facts required to make out a claim for relief or reveals some fact that necessarily defeats the claim. *Wood v. Guilford Cnty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002).

A. <u>Civil Conspiracy Claim</u>

{29}    QA first argues that Loftin's civil conspiracy claim must fail because all of the other coconspirators have already been dismissed, leaving no underlying claims upon which to base a conspiracy claim.[2]  In support, QA cites *Piraino Bros., LLC v. Atlantic Financial Group., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333–34 (2011), and Hon. Calvin E. Murphy's North Carolina Business Court opinion in *Julian v. Wells Fargo Bank, N.A.*, 2012 NCBC LEXIS 32, at *27–28 (N.C. Super. Ct. May 22, 2012) for the contention that, because the other defendants relevant to QA's civil conspiracy claim have been dismissed, no claims remain on which to base a civil conspiracy claim against QA.  QA also argues that Loftin has failed to allege that it agreed to commit or committed an unlawful act.

{30}    Without conceding his other claims, Loftin responds that even if all other claims fail, and regardless of the fact that claims against KPMG and Sidley Austin have been dismissed, their unlawful conduct may still be attributed to QA through a conspiracy claim against QA.  Loftin further argues that the Amended Complaint adequately alleges a conspiracy because it "alleges an agreement between QA, KPMG, and others to design, market, and sell fraudulent and unlawful tax shelters." (Pl. Peter T. Loftin's Mem. Opp'n Def. QA's Mot. Dismiss ("Resp. Br.") 13.)  Loftin also contends that his allegations include sufficient evidence of QA's own unlawful acts.

{31}    To state a claim for civil conspiracy, a complaint must allege (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy.  *State ex. rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 115 (2008).[3]  North Carolina treats civil conspiracy as a dependent claim.  *Toomer v.*

---

[2]  While not dispositive of its ruling, the Court notes its understanding that claims against the Presidio Defendants have not yet been dismissed.

[3]  Some might argue that whether an "overt act" in furtherance of the conspiracy must be expressly pleaded and proved remains unsettled in North Carolina, because opinions from the North Carolina Court of Appeals as recently as 2014 do not expressly list an overt act as an essential element of the claim. *See, e.g.*, *Bottom v. Bailey*, __ N.C. App. __, 767 S.E.2d 883, 890 (2014) (requiring only "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an

*Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." *Id.* However, a claim for the underlying unlawful conduct need not be stated separately in order to maintain a claim for civil conspiracy. *Cf. Roberts v. Huckabee*, No. COA12-1352, 2013 N.C. App. LEXIS 505, at *18–19 (May 31, 2013) (reviewing all sections of a complaint to find allegations to support a claim for civil conspiracy).

{32} QA's reliance on *Piraino Bros.* and *Julian* is misplaced. In both of these cases, substantive, separate claims against the defendants alleged to be members of the conspiracy were the underlying torts on which the civil conspiracy claims rested. *See Piraino Bros., LLC*, 211 N.C. App. at 350, 712 S.E.2d at 334; *Julian*, 2012 NCBC LEXIS 32, at *28. When the courts dismissed these separate claims, either through summary judgment or a Rule 12(b)(6) motion to dismiss respectively, the dismissal necessarily served as a judgment regarding the nonexistence of the unlawful acts underlying the civil conspiracy claims. *See Piraino Bros., LLC*, 211 N.C. App. at 350, 712 S.E.2d at 334; *Julian*, 2012 NCBC LEXIS 32, at *28. Neither case controls here, where there has been a voluntary dismissal with prejudice of all claims against two alleged coconspirators and where QA is separately alleged to be a part of the conspiracy and to have joined in the scheme concocted by the conspiracy. The Court has struggled to find any case law that directly addresses whether a claim of conspiracy can be maintained against one member after the voluntary dismissal with prejudice of the alleged coconspirators.[4]

unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme"). However, in a 2008 North Carolina Supreme Court case delineating the elements of a civil conspiracy claim, the Supreme Court expressly required an overt act, mandating "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *State ex rel. Cooper*, 362 N.C. at 444, 666 S.E.2d at 115 (citing *Muse v. Morrison*, 234 N.C. 195, 198, 66 S.E.2d 783, 785 (1951)). At least implicitly, the cited North Carolina Court of Appeals opinion may include a requirement of some overt act by requiring that there be actual injury.

[4] A conspiracy claim is comparable to an allegation of joint and several liability. *Dalton v. Camp*, 138 N.C. App. 201, 213, 531 S.E.2d 258, 267 (2000), *rev'd in part on other grounds*, 353 N.C. 657 (2001). For joint torts, the common law rule is that dismissal of one tortfeasor would defeat claims against

In absence of clear precedent dictating otherwise, the Court concludes that the claim should survive the current Rule 12(b)(6) Motion. This ruling is without prejudice to QA revisiting the issue in its response to the second amended complaint that the Court requests below, or by subsequent motion for summary judgment.

{33} While the Amended Complaint in many instances fails to direct its allegations separately to the different defendants, the Court nevertheless has failed to be persuaded by QA's argument that Loftin has not pleaded sufficient facts to support a civil conspiracy claim.[5] In his Amended Complaint, Loftin alleges that QA and other defendants agreed to conceal the nature of the FLIP product from Loftin and others (Am. Compl. ¶ 57); that FLIP was "a tax shelter created, marketed and administered by Defendants KPMG and QA" (Am. Compl. ¶ 106); and that QA, KPMG, and others entered into an agreement to devise, design, facilitate, promote, and sell the FLIP product, knowing that the product was fraudulent. (Am. Compl. ¶ 106.) Also, the Amended Complaint alleges that, by agreeing to sell the FLIP product as a tax planning product, each defendant relied on one another to fulfill their role in the conspiracy (Am. Compl. ¶ 113), and specifically that QA relied on KPMG and Sidley Austin to justify the tax treatment of the transactions that QA undertook to implement FLIP. (Am. Compl. ¶ 116.)

{34} QA argues that dismissal is, however, appropriate because the Amended Complaint includes allegations that necessarily defeat the claim alleged. QA argues that the Amended Complaint makes clear that QA has no responsibility for the acts which Loftin claims were unlawful, because QA was not responsible for tax advice and because the investments it was retained to implement were, in fact, lawful and successful. That argument unfairly limits what Loftin has pleaded. He also pleads that QA and KPMG worked together to develop FLIP and continued to market the product knowing it was fraudulent. Accepting the pleadings as true, as

---

others. *See Ramsey v. Camp*, 254 N.C. 443, 444, 119 S.E.2d 209, 211 (1961). This result was changed by the Uniform Contribution Among Tort-Feasors Act. *See* N.C. Gen. Stat. § 1B-4 (2014).
[5] The Amended Complaint often makes generalized allegations against Defendants collectively, without more specific allegations as to which acts are chargeable against which Defendant. This is, in fact, why the Court requests a second amended complaint that will clarify the claims against QA.

it must, the Court concludes that the allegations are adequate to sustain the civil conspiracy claim against QA.

{35} Accordingly, the Motion, as it pertains to Loftin's civil conspiracy claim, is DENIED.

## B. Fraud Claim

{36} QA argues that Loftin's fraud claim should be dismissed because the allegations made it clear that Loftin did not rely on QA when he decided to execute FLIP, having decided to do so before any contact with QA. QA further argues that the heart of the fraud claim is the tax advice given to Loftin and that Loftin's failure to allege that QA was in any way involved in advising Loftin with respect to tax advice or his tax returns should defeat the claim. QA further argues that the fraud claim fails because of Loftin's failure to plead a specific, actionable misrepresentation by QA.

{37} In opposing the Motion, Loftin relies on a liberal standard for pleading fraud, citing *Hudgins v. Wagoner* for the proposition that the requirement of specificity is flexible and that the elements may be inferred by the allegations in the Amended Complaint. 204 N.C. App. 480, 487, 694 S.E.2d 436, 443 (2010). In briefing, going somewhat beyond the specific allegations of the Amended Complaint, Loftin argues that the moment when KPMG introduced Loftin to QA is unclear, and that QA's involvement in FLIP began before Loftin decided to enter the transaction, so that it may be inferred that Loftin relied on QA as well as others in deciding to purchase FLIP. He further asserts that the allegations of the Amended Complaint are adequate to demonstrate that Loftin continued to rely on QA after QA became aware that FLIP was an unlawful tax shelter, and that he would have exited the transaction had QA advised him of FLIP's true nature and QA's concerns regarding FLIP's legality. Finally, Loftin alleges that QA's promise to "comply in all material respects with all material laws, regulations, and rules applicable to it in its performance of its duties and obligations under this Agreement, including . . . (v) all applicable tax laws and regulations" (Defs.' Mem. Supp. Mot. Dismiss Am. Compl.

("Defs.' Mem. Supp.") Ex. 1, § 16) was an affirmative representation that Loftin relied upon when evaluating whether to enter into the FLIP transaction.

{38} To successfully plead a claim for fraud in North Carolina, a party must plead: "(1)[f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive[,] (4) which does in fact deceive, (5) resulting in damage to the injured party." *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568–69, 374 S.E.2d 385, 391 (1988) (emphasis removed) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). A duty to disclose material facts may arise where there is a relationship of trust and confidence between two parties. *Stamm v. Salomon*, 144 N.C. App. 672, 680, 551 S.E.2d 152, 157–58 (2001). In such an instance, "failure to do so constitutes fraud." *Id.* (quoting *Vail v. Vail*, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951)).

{39} North Carolina follows the general rule that, "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." N.C. R. Civ. P. 9(b). This "particularity" requirement mandates that if, "upon a liberal construction of the whole pleading, the charge of fraud might be supported by proof of the alleged constitutive facts," the claim is sufficient. *Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 793, 561 S.E.2d 905, 910 (2002) (quoting *Carver v. Roberts*, 78 N.C. App. 511, 513, 337 S.E.2d 126, 129 (1985)). There is no precise formula for pleading fraud. *See Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 481, 593 S.E.2d 595, 598 (2004).

{40} Loftin alleges that part of his agreement with QA included a guarantee that QA must follow all applicable tax laws and regulations. A final determination may require further proof, but Loftin has made an adequate pleading that might support a relationship of trust and confidence, placing QA under an obligation to disclose any material facts of which it was aware. Loftin alleges that QA became aware of FLIP's adverse tax implications, and that it elected not to share those

implications with Loftin.[6]  If, in fact, such a relationship is proven, a fraud claim may arise from either an affirmative statement or a failure to make a statement that should have been made.

{41}    Therefore, as to the fraud claim, QA's Motion is DENIED.

C.  Breach of Fiduciary Duty Claim

{42}    The issue of whether there was a relationship of trust and confidence also arises in the context of Loftin's breach of fiduciary duty claim.  QA alleges that it owed Loftin no fiduciary duty, and therefore was under no obligation to make disclosures.  QA argues that the scope of its duty, if any, must be no greater than the role it played in the implementation of trades.  Its argument is that, "[e]ven assuming that QA owed Loftin a fiduciary duty despite the absence of any special relationship and the general lack of contact between them, the scope of that duty related to the execution of the investment trades, which occurred as agreed and is not challenged here." (Defs.' Mem. Supp. 15.)  QA contends that it should not be liable for any loss because the investment trades for which it was retained were successful.  Loftin counters that a fiduciary duty arises as a matter of law when an investment advisor receives compensation for its services, and that, under the facts of this case, the scope of QA's duty is sufficiently broad to create in QA a responsibility to disclose either FLIP's status as an unlawful tax shelter to Loftin or QA's concern in that regard.  (Resp. Br. 19–20 (citing 15 U.S.C. § 80a-35(b) (2015).)

{43}    "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001).  The North Carolina Supreme Court has defined a fiduciary relationship as one in which

---

[6] There is the potential for an inference that QA's insistence on registering FLIP as a tax shelter was for the express purpose of concealment from FLIP investors, including Loftin.  The Court carefully notes that registration as a tax shelter is not necessarily evidence of the illegality of a tax strategy.  But, at the motion to dismiss stage, the Court must consider permissible inferences.  In doing so, it concludes that, when construed in a light most favorable to Loftin, Loftin could ultimately be able to prove that QA knew that FLIP may not actually have the tax implications as originally represented to Loftin when marketing the overall FLIP strategy.  Of course, the record may develop much more in QA's favor.

there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . ., [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

*Id.* at 651–52, 548 S.E.2d at 707–708 (alteration in original) (emphasis omitted) (internal quotation marks omitted) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)).

{44}     Loftin alleges in his Amended Complaint that he relied on QA and the other Defendants because of their reputations in the industry.  He further alleges that QA represented that it would serve as advisor and guardian over his interests with respect to the FLIP transactions, and that QA represented to Loftin that their relationship was a confidential one.  The Court concludes that these allegations, although general, are minimally adequate to allow Loftin to survive QA's Rule 12(b)(6) Motion.  Much greater specificity would be required by a Rule 56 standard.

{45}     The motion to dismiss the breach of fiduciary duty claim is DENIED.

### D. Constructive Fraud

{46}     QA argues that Loftin's claim for constructive fraud fails because (1) no fiduciary duty existed between Loftin and QA, and (2) Loftin has not alleged that QA benefitted from an "unfair advantage." (Def.'s Mem. Supp. 16.)  QA cites *Sterner v. Penn* for the proposition that fees paid to an investment advisor cannot be considered a benefit for purposes of satisfying the elements of constructive fraud. 159 N.C. App. 626, 632, 583 S.E.2d 670, 679 (2003).

{47}     Loftin counters that, regardless of the holding in *Sterner*, QA did not only receive a commission on the sale of securities.  Rather, QA received

fees upon [Defendants'] calculation of the capital losses and basis shift generated through the FLIP tax shelter and to share among themselves the fees generated by each tax shelter sold. . . . [The fees] were computed by taking approximately seven percent of the amount of the "basis shift" that KPMG calculated FLIP would purportedly create.

(Am. Compl. ¶ 107.)

{48} A claim for constructive fraud requires: "(1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Marketplace Antique Mall, Inc. v. Lewis*, 163 N.C. App. 596, 599, 594 S.E.2d 121, 124 (2004). The difference between a claim for breach of fiduciary duty and a constructive fraud claim is the requirement that the defendant benefit himself. *Trillium Ridge Condo. Ass'n v. Trillium Links & Vill., LLC*, __ N.C. App. __, 764 S.E.2d 203, 220 (2014). *But see Compton v. Kirby*, 157 N.C. App. 1, 16, 577 S.E.2d 905, 914 (2003) ("[B]reach of fiduciary duty amounts to constructive fraud.").

{49} *Sterner* involved several securities firm defendants who were instructed to make trades by an advisor who held himself out to an investor as a professional investment manager. *Sterner*, 159 N.C. App. at 627–28, 583 S.E.2d at 671–72. When the investment manager lost virtually all of the investor's investment, the investor sued both the investment manager and the securities firms with whom he had placed the clients' assets, alleging, *inter alia*, constructive fraud. *Id.* The securities firms successfully moved to dismiss the claims, and the investor appealed. *Id.* at 628, 583 S.E.2d at 672. In affirming the trial court's dismissal of the claims, the North Carolina Court of Appeals held that the benefit sought by a defendant must be more than a continued relationship with the plaintiff, and that a payment of a fee for work that the defendant did for the plaintiff is not sufficient evidence of an unfair advantage.[7] *Id.* at 631–32, 583 S.E.2d 674 (citing *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 667, 488 S.E.2d 215, 224 (1997)); *NationsBank of N.C., N.A. v. Parker*, 140 N.C. App. 106, 114, 535 S.E.2d 597, 602 (2000).

{50} The Court does not believe *Sterner*'s holding should be applied as broadly to the facts of this case as QA urges. *Sterner* states that "payment of a fee

---

[7] The *Sterner* court found this sufficient to dismiss the claim, and never addressed the existence of a duty owed by the securities firms with reference to the constructive fraud claim. *Id.* at 632, 583 S.E.2d at 674.

to a defendant for work done by that defendant does not *by itself* constitute sufficient evidence that the defendant sought his own advantage." *Id.* at 632, 583 S.E.2d at 674 (emphasis added) (quoting *NationsBank of N.C., N.A.*, 140 N.C. App. at 114, 535 S.E.2d at 602). Loftin's allegations are not limited to QA's mechanical completion of the transactions implementing FLIP,[8] but also include that QA assisted in creating FLIP and continued to implement it after developing misgivings about its tax effect for the purpose of participating in the overall profits of a potentially fraudulent scheme. Therefore, QA may have enjoyed a benefit adequate to sustain the claim, and Court does not believe that the constructive fraud claim should be dismissed at the pleading stage on this basis.

{51} As to the claim for constructive fraud, the Motion is DENIED.

### E. Negligent Misrepresentation Claim

{52} A negligent misrepresentation claim, as opposed to a fraud claim, may fail when the claim is based solely on a failure to disclose, rather than on an actual representation. *See Harrold v. Dowd*, 149 N.C. App. 777, 782–83, 561 S.E.2d 914, 918–19 (2002) (dismissing claim of negligent misrepresentation for failure to allege a disclosure of information).

{53} Repeating arguments addressed to other claims, QA argues that Loftin has not adequately alleged reliance on any QA statement adequate to sustain a claim for negligent misrepresentation. In support, QA asserts that (1) Loftin could not have relied on QA, because he decided to execute FLIP prior to any contact with QA, and (2) Loftin had retained QA only as an investment advisor, and not a tax advisor. QA further asserts that, because there were other, professional tax advisors retained as part of the execution of FLIP, and because QA relied on those tax advisors to justify the tax treatment of the FLIP transactions, Loftin could not

---

[8] There are other differences between QA and the defendants in *Sterner* that the Court need not specifically analyze in order to reach its conclusion that *Sterner*'s holding does not control resolution of the Motion, including, but not limited to, the level of discretion that QA had over the transactions, the complexity of the transactions, and the interrelationship of the various parties responsible for implementing FLIP.

have relied on QA's representations or omissions with respect to the tax treatment of the FLIP transactions.

{54} Loftin's negligent misrepresentation claim essentially seeks to recast the same facts as his fraud and constructive fraud claims, but the Court has allowed those claims to proceed largely on the basis that the allegations are sufficient to create a claim of a relationship that imposes a duty to disclose, rather than on the basis of an affirmative representation. For the negligent misrepresentation claim, the Court instead must inquire whether there has been an adequate allegation of an actual, affirmative representation beyond statements made in the context of recitals in the contract between the parties.

{55} To state a claim for negligent misrepresentation, "a party [must] justifiably [rely] to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988). For the negligent misrepresentation claim to survive against QA, QA must itself have negligently made representations upon which Loftin relied. Representations in a contract that create an obligation do not give rise to a claim for negligent misrepresentation when that obligation is not performed. *Supplee v. Miller-Motte Bus. Coll., Inc.*, __ N.C. App. __, 768 S.E.2d 582, 600 (2015) ("The duty that defendants had [to perform an obligation] arose under the terms of the contract between the parties and not by operation of law independent of the contract. As such, the breach of that contractual duty cannot provide the basis for an independent claim of negligent misrepresentation."). Accordingly, any representations by QA must have been made beyond those promises stated in the Investor Advisory Agreement.

{56} In his Amended Complaint, Loftin alleges that

[t]he information, advice, and recommendations provided by Defendants to Loftin concerning the soundness and viability of FLIP . . . , the manner in which the strategies would be implemented on their behalf, and the tax treatment and effect to be given them, *as*

*alleged above*, were false, and if not made intentionally, were made negligently.

(Am. Compl. ¶ 199 (emphasis added).) Although both parties discuss whether the reliance element has been met, the Court finds the absence of allegations of an affirmative misrepresentation by QA to be dispositive. The Court has struggled to find in Loftin's ninety-nine page, 219 paragraph Amended Complaint any actual statement made by QA to Loftin regarding the process that would be undertaken to implement FLIP. Under *Supplee*, QA's contractual promise to adhere to relevant tax laws and regulations cannot provide the basis for QA's claim of negligent misrepresentation. Even if the Court could parse any such statement from the broad allegations made against all Defendants collectively, it has found no allegation that QA failed to exercise due care when making an affirmative statement to Loftin.

{57} The motion to dismiss the claim for negligent misrepresentation is GRANTED.

## F. UDTP Claim

{58} Conduct that amounts to a breach of fiduciary duty and constructive fraud, under certain circumstances, may be sufficient to support certain elements of a UDTP claim in North Carolina. *Trantham v. Michael L. Martin, Inc.*, __ N.C. App. __, 745 S.E.2d 327, 333 (2013). The Court does not believe, however, that such breach or constructive fraud constitutes a *per se* violation of Chapter 75.

{59} Further, such claims may fail if they are outside Chapter 75's intended ambit. Section 75-1.1(a) of the General Statutes regulates "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a) (2014). Subsection 1.1(b) defines "commerce" as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." *Id.* § 75-1.1(b). The statutes do not further define "learned profession," but North Carolina courts

have addressed the statute's scope in this regard. *See, e.g., Reid v. Ayers*, 138 N.C. App. 261, 531 S.E.2d 231 (2000).

{60}    In *Reid v. Ayers*, the North Carolina Court of Appeals established a two-part test to determine whether activities fell within the learned profession exception: (1) "the person or entity performing the alleged act must be a member of a learned profession," and (2) "the conduct in question must be a rendering of professional services." *Id.* at 266, 531 S.E.2d at 235. Courts have included several professions within the exception, but have not included the services of investment professionals within its purview. *See, e.g., Sharp v. Gailor*, 132 N.C. App. 213, 510 S.E.2d 702 (1999) (holding that the practice of law falls within the learned profession exception); *Abram v. Charter Med. Corp. of Raleigh, Inc.*, 100 N.C. App. 718, 398 S.E.2d 331 (1990) (holding that a health care provider is engaged in a learned profession).

{61}    Case law has delineated other exceptions to Chapter 75 based on reasoning similar to the preemption doctrine, stating that certain claims are not "in commerce." In *Bache Halsey Stuart, Inc. v. Hunsucker*, the North Carolina Court of Appeals evaluated the efficacy of a Chapter 75 claim based on a commodities action, and in disallowing the claim noted that "[i]t would be inappropriate . . to expand a traditional common law action into an unfair trade practice in the face of [a] pervasive federal regulatory scheme." 38 N.C. App. 414, 420–21, 248 S.E.2d 567, 570 (1978). Discussing *Hunsucker*, in *Skinner v. E. F. Hutton & Co.*, the North Carolina Supreme Court found that securities transactions were excluded from the scope of Chapter 75. 314 N.C. 267, 274–75, 333 S.E.2d 236, 241 (1985). The allegations in *Hunsucker* and *Skinner* were not limited to the mechanical trading of securities. In *Skinner*, particularly, the defendant securities broker was alleged to have induced the plaintiffs to purchase certain securities and to have provided them false information and advice, in addition to processing the plaintiffs' trades. *Id.* at 267–69, 333 S.E.2d at 237–38.

{62}    QA argues that it was performing its duties solely as an investment advisor, and that its role was limited to conducting the securities transactions

necessary to implement FLIP.  Citing no support for its assertion, QA also claims that it rendered professional services and is protected by the learned profession exception.

{63}    Loftin's brief does not address QA's "learned profession" assertion.  He instead attempts to distinguish the UDTP claim from those that fall within the recognized securities transactions exception.  He argues that his claim is not an action regarding securities transactions, but rather is an action attacking the unlawful tax scheme he alleges against the Defendants.  Loftin contends that the fact that a part of that scheme may have involved securities transactions does not insulate the overall scheme from liability under Chapter 75.  Loftin argues that, for this reason, *Skinner* does not apply, and QA's activities fall within the UDTP Act's definition of "commerce."

{64}    The Court has found no support for QA's contention that a general "investment services" role constitutes a "learned profession" under Chapter 75.  The Court does not believe that it needs to address that argument any further.

{65}    The Court believes QA's reliance on the securities transaction exception has greater credibility.  This is an action that, at a minimum, relates to securities transactions.  Loftin alleges to have retained QA to effect the trades necessary to execute FLIP and cites multiple instances of QA having completed securities transactions.  Also, the agreement between Loftin and QA was referred to as an "Investment Advisory Agreement."  (Am. Compl. ¶ 177(c).)  Thus any allegations directed specifically to QA's securities transactions fall within the *Skinner* rule, excluding them from the definition of "commerce" under Chapter 75 and preventing any claims made on the basis of those transactions.

{66}    Regarding Loftin's argument that the matter more broadly concerns a fraudulent tax scheme allowed within Chapter 75's reach, the Court finds no meaningful distinction between this case and cases that have been ruled to be outside of Chapter 75's scope.  The Court believes that QA's alleged involvement in "fraudulently marketing and selling illegal and abusive tax shelters" (Am. Compl. ¶ 213), when coupled with its role as the transaction agent responsible for executing

FLIP, are sufficiently similar to the allegations against the *Skinner* defendant, and should be controlled by the *Skinner* court's holding.  Similar to *Skinner*, where the allegations involved false advice and fraudulent induction into securities transactions and the implementation of those transactions, any QA participation in the alleged scheme centered on QA's involvement in the securities transactions. The duty of disclosure Loftin has asserted against QA arises from QA's role as an investment advisor carrying out securities transactions.  While not necessary to its conclusion, the Court further notes that any potential tax shelter, fraudulent or otherwise, falls under the regulatory ambit of the IRS, the North Carolina Securities Act, or perhaps also the SEC.  *Hunsucker* might then suggest a further basis for concluding that Loftin's UDTP claim is not within the scope of Chapter 75.

{67}    The motion to dismiss with respect to Loftin's UDTP claim is GRANTED.

### G. Damages

{68}    Finally, QA claims that all of Loftin's claims should be dismissed because QA did not cause any of Loftin's damages but rather only completed profitable trades on Loftin's behalf.  QA argues that the damages were only related to Loftin's tax returns, and that because QA had no role in preparing those returns, the Court should assign it no responsibility for the losses Loftin incurred.

{69}    In response, Loftin argues that QA has misconstrued the Amended Complaint.  Instead, he assigns QA's responsibility not only to its completion of the investment transactions but also to its involvement in the development and marketing of the FLIP product and its alleged misrepresentation and failure to disclose facts to Loftin regarding FLIP.  He also points out that his damages are not limited to the tax aspect of FLIP but also consist of the fees paid to QA.

{70}    The Court concludes, without reiterating the discussion above, that Loftin has adequately alleged facts that, if proven, may assign some responsibility

for Loftin's tax-related damages to QA.[9]  Therefore, the Court does not dismiss any of the claims on the basis that damages have not been adequately alleged.

## H. LEAVE TO AMEND

{71}    In his Memorandum in Opposition to Defendant QA's Motion to Dismiss, Loftin requests that, if the Court is inclined to grant any part of QA's Motion, Loftin should first be allowed to further amend his Amended Complaint to more particularly direct the allegations toward QA's specific conduct.  QA resists, claiming that Loftin should not be allowed to amend his complaint a second time, particularly because it contends the existing Amended Complaint affirmatively alleges facts that defeat any claims against QA. The Court has separately considered whether it should order a second amended complaint to clarify the claims and to eliminate unnecessary allegations as to defendants who have now been dismissed.

{72}    The Court may, "in the appropriate case, treat a motion to dismiss under [Rule 12(b)] as a motion for a more definite statement under [Rule 12(e)]." *Page v. Mandel*, 154 N.C. App. 94, 97, 571 S.E.2d 635, 637 (2002).  It may do so in its discretion, *ex mero motu.  Id.*

{73}    The original Complaint in this case was filed in December 2003, and the operative Amended Complaint was filed over eight years ago, in November 2006.  Since that time, and after a substantial stay, KPMG and Sidley Austin have been dismissed as defendants.  The Amended Complaint is unusually long and complex.  At the same time, the allegations broadly group facts as to all Defendants, making it difficult to discern how the allegations are specifically applicable to QA.

{74}    The Court finds this an appropriate case in which to exercise its discretion to order a more definite statement.  The Court directs Loftin to further amend his Amended Complaint consistent with this Order & Opinion, and requests

---

[9] In order to reach its conclusion, the Court need not evaluate the argument as to whether the payment of investment fees of the type involved in Loftin's purchase of FLIP may be considered "damages" for the purpose of bringing a claim.  (*See* Def.'s Mem. Supp. 18–19; Resp. Br. 23.)

that he do so in a manner that eliminates allegations no longer necessary in light of those defendants that have been dismissed and in a manner to facilitate an easier determination of how the facts alleged apply to those defendants that remain.

## I.  CONCLUSION

{75}    For the foregoing reasons, it is ORDERED that:

1.  As to Loftin's claims for (a) civil conspiracy, (b) fraud, (c) breach of fiduciary duty, and (d) constructive fraud, QA's Motion is DENIED.

2.  As to Loftin's claims for negligent misrepresentation and UDTP, QA's Motion is GRANTED.

3.  Loftin shall file an amended complaint consistent with this Order & Opinion within thirty days of the Order & Opinion's filing.


This the 30th day of April, 2015.